## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| DANIEL E. CARPENTER<br>Petitioner<br><br>v.<br><br>UNITED STATES OF AMERICA<br>Respondent | )<br>)<br>)<br>)<br>)    CRIMINAL NO. 3:13-CR226 (RNC)<br>)<br>)<br>)    November 4, 2021<br>) |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PETITIONER'S APPLICATION TO VACATE CONVICTION AND DISMISS INDICTMENT

### PRELIMINARY STATEMENT

Petitioner Daniel Carpenter is an innocent man, wrongfully accused, wrongfully indicted, and wrongfully prosecuted for a nonexistent crime that he did not commit, which he had nothing to do with, and which was based on a conspiracy that he was not a part of, never participated in, and certainly never joined. He is also the victim of prosecutorial abuse and government misconduct that, at the very least, should merit dismissing the Superseding Indictment in this case and vacating his conviction. In addition to the numerous constitutional infirmities addressed at length in Petitioner's Motion for a Judgment of Acquittal pursuant to Rule 29(c), which is hereby incorporated by reference, Petitioner did not received a fair trial or Due Process for a number of additional reasons addressed herein, and this Court is asked to exercise its broad discretion to immediately vacate the Judgment in this case and dismiss the broadened and untimely Superseding Indictment of 2014 based on its failure to state any conduct of the Petitioner that constitutes a criminal offense.

### IMMEDIATE ORDER TO SHOW CAUSE REQUESTED

# I. THE SUPREME COURT'S DECISION IN *MARINELLO* MANDATES RELIEF IN THIS CASE

In *Marinello v. United States*, 138 S.Ct. 1101 (2018), the Supreme Court cited to several famous cases requiring a defendant to not only know what conduct he is doing that crosses the line into a crime or conduct proscribed by law, he must also know what punishment he will face for breaking the law should he willfully pass that line:

> "Willfulness...requires the Government to prove that the law imposed a duty on the defendant, **that the defendant knew of this duty, and that he voluntarily and intentionally violated that duty.**" *Cheek* v. *United States*, 498 U.S. 192, 201 (1991). A taxpayer may know with a fair degree of certainty that her babysitter will not declare a cash payment as income-and, if so, a jury could readily find that the taxpayer acted to obtain an unlawful benefit for another. For the same reason, we find unconvincing the dissent's argument that the distinction between "willfully" and "corruptly"-at least as defined by the Government-reflects any meaningful difference in culpability.
>
> Regardless, to rely upon prosecutorial discretion to narrow the otherwise wide-ranging scope of a criminal statute's highly abstract general statutory language places great power in the hands of the prosecutor. Doing so risks allowing "policemen, prosecutors, and juries to pursue their personal predilections," *Smith* v. *Goguen*, 415 U.S. 566, 575 (1974), which could result in the non-uniform execution of that power across time and geographic location. And insofar as the public fears arbitrary prosecution, it risks undermining necessary confidence in the criminal justice system. That is one reason why we have said that we "cannot construe a criminal statute on the assumption that the Government will 'use it responsibly.'" *McDonnell* v. *United States*, 136 S.Ct. 2355 (2016) (quoting *United States* v. *Stevens*, 559 U.S. 460, 480 (2010)). And it is why "[w]e have traditionally exercised restraint in assessing the reach of a federal criminal statute.
>
> We wrote that we have traditionally exercised restraint in assessing the reach of a federal criminal statute, both out of deference to the prerogatives of Congress and out of concern that *a fair warning should be given to the world in language that the common world will understand, of **what the law intends to do if a certain line is passed**. McBoyle v. United States*, 283 U.S. 25, 27 (1931)." *Marinello* at 1106-09 (emphasis added).

If Marinello did not have "Fair Warning" that he would be punished for his conduct, certainly Petitioner could not have had "Fair Warning" that his conduct involving Grist Mill Capital lending money to the Charter Oak Trust could possibly be criminal and that he could be punished for that conduct. But more than that, *Marinello* says that in addition to the "knowledge" that you were breaking the law, you must also know that the law intends to punish you once you

cross that "brightly marked" line. Interestingly, in *Marinello,* the Supreme Court determined that *Marinello* not only lacked adequate "Fair Warning" that he had committed a crime, but he also had no conception that he could go to prison for his conduct. Perhaps the best analogy the Supreme Court uses in *Marinello* is that every American couple pays their babysitter in cash. Neither the parents nor the babysitter report that transaction to the IRS as taxable income. Clearly, that could be considered a violation of the tax laws, but no one would seriously believe the babysitter would be sentenced to 30 months for accepting cash "under the table" for doing her job.

In fact, prior to *Marinello*, this Court granted a new trial in *United States v. Gramins* based largely on the same concept as expressed in the Second Circuit's decision in *United States v. Litvak*, 889 F.3d 56 (2d Cir. 2018) ("*Litvak II*"). Petitioner wishes to focus on page 20 of this Court's decision in *Gramins*, which mentions the acquittal of the defendant David Demos in *United States v. Demos*, No. 16-cr-220:

> "In *United States v. Demos*, another case involving misrepresentations by a broker-dealer in the RMBS market, Judge Thompson barred counsel and expert witnesses from using the terms "broker" and "commission" because "[j]urors may be familiar with brokers and the concept of commission in their own affairs and associate those terms with an agency relationship." The jury acquitted Demos on all counts. *See id.*" *See* page 20, n.8:

Mr. Demos was acquitted in large part **because the jury instructions in his case were drawn from this Court's decision in *Shapiro***. For example, this Court stated in *Shapiro:*

> "**I don't think you can be convicted under the Constitution unless you had a sufficiently culpable state of mind such that you made a conscious choice to cross an important line and expose yourself to potential imprisonment**....The Supreme Court has recognized that when a challenged action or course of conduct is a technical violation of the law as opposed to morally reprehensible it becomes more important to make it clear to the jury that the Government has a burden to prove that the defendant knew his conduct was unlawful. **Why? Because we don't want to be exposing people to conviction and incarceration if they didn't know that this is what they were risking.**" *Demos citing Shapiro* at Vol. XIII, 2617.

But, this Court is also quoted in *Demos* as saying:

> To establish that a defendant 'willfully violat[ed]' the anti-structuring law, **the Government must prove that the defendant acted with knowledge that his conduct was unlawful.**" *Ratzlaf v. United States*, 510 U.S. 135, 137 (1994).... As a general matter, when used in the criminal context, a "willful" act is one undertaken with a "bad purpose." In other words, in order to establish a "willful" violation of a statute, "**the Government must prove that the defendant acted with knowledge that his conduct was unlawful.**" *Bryan v. United States*, 524 U.S. 184, 191 (1998).

Then, the final quotations of this Court from *Shapiro* that led to the acquittal in *Demos* and a new trial order in *Gramins* is particularly relevant to this Motion:

> "*As the Government concedes, lying in arms-length commercial transactions is not always illegal. It depends on the particular facts and circumstances.*" *See Regent Office* at 1179 (**lies that are "repugnant to standards of business morality" may nevertheless be insufficient to support a criminal conviction for fraud**). Prior to the indictment in Litvak, the conduct at issue appears to have been widespread in the RMBS market. Cooperating witnesses in this case testified that they didn't realize the conduct was illegal. After a series of trials involving five defendants charged with essentially the very same conduct, only Mr. Gramins currently stands convicted on any count in any of the indictments. It is possible the jury convicted him on the conspiracy count, and hung or acquitted as to all other counts in the indictment, only because it was persuaded that he continued to engage in the conduct notwithstanding the Litvak indictment. Others who engaged in this conduct have been the subject of civil enforcement proceedings or no enforcement proceedings at all. It is fair for the defendants to wonder what distinguishes their conduct from that of others who have been spared indictment. *I would rather risk error on the side of lenity than the other way.*"

Clearly, if the defendants in *Marinello, Demos, Shapiro,* and *Gramins* did not know that they were "crossing the line" and "breaking the law," and that they did not know they could be prosecuted **and punished** for their conduct, Petitioner respectfully suggests that there are far fewer "STOLI fraud" cases in America than even the few cases involving brokers lying to clients on Wall Street. Based on the above, Petitioner respectfully believes he is entitled to a review and reconsideration of this Court's June 6, 2016 Verdict in light of *Litvak II*, the new trial order in *Gramins*, and the acquittal in *Demos*, largely based on this Court's writings in *Shapiro*.

The Indictment must also be dismissed because it fails to allege any "**knowledge**" on the

4

part of the Petitioner that he was **willfully** participating in a scheme to defraud. One of the elements which has been considered **indispensable** to an indictment for any type of crime is **knowledge**; e.g., knowledge that a law was broken. In *Pettibone v. United States*, 148 U.S. 197, 206-07 (1893), the defendants were charged with encouraging mine workers to disobey an injunction, and the Supreme Court, in reversing their convictions, stated:

> It seems clear that an indictment against a person… must charge a knowledge or notice, on the part of the accused….Unless that fact exists, the statutory offense cannot be committed…and without such knowledge or notice, the evil intent is lacking.

In *Direct Sales v. United States*, 319 U.S. 703 (1943), the Supreme Court further affirmed the position it had taken in *Pettibone* fifty years prior, and stated:

> Without the knowledge, the intent cannot exist….Furthermore, to establish the intent, the evidence of knowledge must be clear, not equivocal….This, because charges…are not to be made out by piling inference on inference, thus fashioning…a dragnet to draw in all substantive crimes. *Id.* at 711.

The Supreme Court has also made it very clear that unless and until there is the "concurrence" of an evil meaning mind with an evil act, there is no crime. *See Morissette v. United States*, 342 U.S. 246, 251-52 (1952) ("Crime, as a compound concept, generally constituted only from concurrence of an evil-meaning mind with an evil-doing hand," quoting Justice Holmes' famous observation that "[e]ven a dog distinguishes between being stumbled over and being kicked."). That has been called the cornerstone of American jurisprudence. *See Elonis v. United States*, 135 S.Ct. 2001 (2015) *citing Liparota v. United States*, 471 U.S. 419, 427 (1985) ("It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil."). There is no mention in the Indictment of Petitioner's "specific intent" to defraud anyone, nor is there any mention in the Verdict of the "concurrence of an evil-meaning mind with an evil-doing hand." As the Verdict makes clear, Petitioner did not fill out, sign, or send in any of the applications. And, quoting from the Verdict, the worst thing Petitioner may

have done was to tell people to lie for him, which after the Supreme Court's decision in *Marinello* and certainly the "Bridgegate" case of *Kelly v. United States*, 140 S. Ct. 1565 (2020) the fact that someone lied or even worse told someone to lie, cannot possibly constitute mail or wire fraud.

Therefore, since the Indictment is devoid of any "evil acts" actually done by Petitioner and any "evil mind" is pure conjecture on the part of the Government and is not found anywhere in the Indictment or the Verdict, Petitioner's Conviction should be vacated and Superseding Indictment should be dismissed in its entirety with prejudice. Because of the lack of any specific intent to defraud in the Indictment, or proof that Petitioner knew he was committing a crime and could be punished for his conduct, Petitioner respectfully asks this Court dismiss his Indictment as was done by the Second Circuit in *Aleynikov* pursuant to Rule 12(b)(3)(B) and as was done by the Supreme Court in *Marinello*.

The use of Justice Oliver Wendell Holmes' description of knowing what Society will do to you when the "bright line" of the law is crossed is particularly appropriate for this case, because the defendant in *McBoyle* literally stole an airplane but was charged under the Automobile Act as if he had stolen a car. Despite the defendant in *McBoyle* knowing that he was breaking the law by stealing, he had his conviction vacated because he was charged under an improper statute that did not include airplanes. In this case, however, Petitioner was accused of Mail and Wire Fraud, but at this late date, there is not a single exhibit showing that Petitioner lied to anyone about anything at any time or that he had the intent to steal anyone's money, or cause "tangible economic harm" to any carrier, or that he caused any mailing or wire **in furtherance of** any fraud. Furthermore, the government has demonstrated its "truly neglectful" and "demonstrably lackadaisical attitude" to Petitioner's rights by continuing to violate his

Constitutional rights eight years after his indictment and 14 years after the alleged crime took place.

In his highly regarded report to Congress on mail and wire fraud dated July 21, 2011, Charles Doyle of the Congressional Research Service, states that the elements of mail and wire fraud that must be alleged in an indictment and **proven beyond a reasonable doubt** before someone can be convicted are that the defendant(s):

(1) Used either mail or wire communications **in the foreseeable furtherance**,

(2) of a scheme to defraud,

(3) involving a material deception,

(4) with the intent to deprive another of,

(5) either property or honest services.

*See* report to Congress on the elements of mail and wire fraud by the Congressional Research Service, CRS Report R41931, *Mail and Wire Fraud: An Abridged Overview of Federal Criminal Law*, by Charles Doyle, July 21, 2011. Failure to properly allege each and every one of these elements with sufficient facts renders an indictment facially invalid. "Where guilt depends so crucially upon such a specific identification of fact, our cases have uniformly held that an indictment must do more than simply repeat the language of the criminal statute." *United States v. Russell*, 369 U.S. 749, 764 (1962). Suffice it to say, the Government did not prove **any** of these five elements at Petitioner's trial, much less proving **all** five beyond a reasonable doubt as Charles Doyle's 2011 Report to Congress says is required.

Petitioner's Indictment is also devoid of any **specific** intent to defraud, or the Second Circuit's required "tangible economic harm." In fact, the words "mens rea," "scienter," and even the "specific intent to defraud" are nowhere to be found in the Superseding Indictment, even

7

though those words are required by the US Attorney's Manual. *See USAM Chapter 9-43.000, Criminal Resource Manual at 948*. This fact alone renders the Superseding Indictment defective. Just reciting the basic elements of Mail and Wire Fraud are not enough in the Second Circuit, or any circuit for that matter. The Government must allege specific facts in an indictment that comprise a crime. *See Russell* at 764. In Petitioner's case, they literally did a carbon copy of the indictment in *Binday* wrongfully describing STOLI as a crime and with just changing the names of the defendants.

The essence of the Government's indictment is that Petitioner allegedly did not disclose certain information to the carriers that according to the Government, would have resulted in the carriers not issuing those policies. Not only is this a clear violation of the *Shellef* Doctrine, *see United States v. Shellef*, 507 F.3d 82 (2d Cir. 2007)and *Skilling v. United States*, 561 U.S. 358, 410 (2010)("Nondisclosure is outside the bounds of the Fraud Statutes. . . ,"), it also results in a Constructive Amendment of the Indictment as described in Judge Preska's scholarly opinion dismissing the defendant's indictment in the famous World Trade Center case of *United States v. Davis*, 2017 WL 3328240 (S.D.N.Y. 2017), where the defendant was also accused of mail and wire fraud by not disclosing the true nature of his Minority Business status:

> The theory of "constructive amendment" is based on the fundamental principle that "after an indictment has been returned its charges may not be broadened through amendment except by the grand jury itself." *Stirone v. United States*, 361 U.S. 212, 215-16 (1960). "To prevail on a constructive amendment claim, a defendant must demonstrate that either the proof at trial or the trial court's jury instructions so altered an essential element of the charge that, upon review, it is uncertain whether the defendant was convicted of conduct that was the subject of the grand jury's indictment." *United States v. Salmonese*, 352 F.3d 332, 337 (2d Cir. 1998); *see also United States v. LaSpina*, 299 F.3d 165, 181 (2d Cir. 2002). Although the Court must permit "significant flexibility in proof," the defendant must be provided with "notice of the core criminality to be proven at trial." *LaSpina* at 181 (*quoting United States v. Delano*, 55 F.3d 720, 729 (2d Cir. 1995)). A constructive amendment is a per se violation of the Fifth Amendment, *LaSpina* at 181, and constructive amendments have been found when the government alleges one theory of the case in the indictment but argues another at trial. *Stirone* at 217 (proof of interference

with interstate shipment of steel from Pennsylvania to Michigan and Kentucky was constructive amendment of indictment that alleged interference with shipment of sand into Pennsylvania).

Judge Preska goes on to examine the history of the Constructive Amendment Doctrine in the Second Circuit:

> In considering the issue of constructive amendment, the Court is mindful that it is a fairly narrow doctrine in this Circuit. *See United States v. Lee*, 833 F.3d 56, 70 (2d Cir. 2016) (explaining that "this court has proceeded cautiously in identifying [constructive amendment]") Indeed, the Court is aware of only six cases since 1988 in which the Court of Appeals has found constructive amendments. *See United States v. Mollica*, 849 F.2d 723, 730 (2d Cir. 1988); *United States v. Zingaro*, 858 F.2d 94, 99 (2d Cir. 1988); *United States v. Milstein*, 401 F.3d 53, 65 (2005); *United States v. Wozniak*, 126 F.3d 105, 111 (2d Cir. 1997); *United States v. Dhinsa*, 243 F.3d 635 (2d Cir. 2001); *United States v. Hassan*, 578 F.3d 108 (2d Cir. 2008). Over the past five years the Court of Appeals has cited *United States v. D'Amelio*, 683 F.3d 412 (2d Cir. 2012)—a leading 2012 constructive amendment case—a total of nineteen times. *See, e.g., United States v. Bastian*, 770 F.3d 212, 220 (2d Cir. 2014). The Court of Appeals did not find a constructive amendment in a single one of those nineteen cases. Even after taking this background into account, however, the Court concludes that a constructive amendment occurred here.

Significantly, for Petitioner's benefit, Judge Preska carefully explains the law of Constructive Amendment in the Second Circuit:

> To establish constructive amendment of an indictment in violation of the Fifth Amendment, "a defendant must show that the trial evidence or jury instructions 'so altered an essential element of the charge that, upon review, it is uncertain whether the defendant was convicted of conduct that was the subject of the grand jury's indictment." *Bastian* at 220 (*quoting Rigas* at 227). "A constructive amendment occurs where the actions of the court 'broaden the possible bases for conviction from that which appeared in the indictment." *Id.* (*quoting United States v. Banki*, 685 F.3d 99, 118 (2d Cir. 2011)). The Court of Appeals elaborated upon the standard as follows: Even if an indictment might have been drawn in more general terms to encompass the ultimate conviction, where "**only one particular kind of [criminal conduct] is charged ... a conviction must rest on that charge and not another**." *Zingaro* at 99(emphasis added) *Davis* at 35.

In *Davis*, the defendant really did lie, cheat, steal, and over-bill the client over $70 million on the reconstruction of the World Trade Center. But, then the Government claimed that Davis misrepresented the status of his minority-owned businesses, which of course had nothing

whatsoever to do with the crime charged in the indictment. Just as the "right to control" theory of fraud is cabined by the need to prove the intent by the defendant to cause "tangible economic harm" to the victim, Judge Preska also makes clear that the "right to control" theory must also be clearly stated in the indictment, and under *Shellef, Starr, and Regent Office*, the essential nature of the information must be clear. Not only are the words "right to control" nowhere to be found in Petitioner's Superseding Indictment, neither are the words required by the *Shellef* Doctrine or by *Skilling*, and certainly the intent to cause "tangible economic harm" is missing because no such harm could possibly exist according to the Second Circuit's recent decision in *AEI v. Lincoln*. Thus making the Government's use of the *Binday* "Right to Control" Theory of Fraud a Constructive Amendment of the Superseding Indictment and ignoring the requirement to prove an intent to cause "tangible economic harm." This requires an automatic dismissal of the Superceding Indictment and vacating of Petitioner's Conviction.

Just as Judge Kearse's dissent in *United States v. Blaszczak*, 947 F.3d 19 (2d Cir. 2019) and Judge Jacobs dissent in *Marinello v. United States,* 138 S.Ct. 1101 (2018) strongly and accurately predicted the Supreme Court's decision to vacate the Second Circuit's opinions, Petitioner respectfully asserts that the Constitutional defects in his Superseding Indictment are more demonstrable than all of those cases and require this Court to dismiss the Indictment as was done in *Pirro, Aleynikov,* and *Litvak* for failure to have all of the facts necessary to establish the elements of a federal crime in the indictment: However, "[a] charge in an indictment is insufficient and must be dismissed when it does not describe conduct that is a violation of the criminal statute charged." *United States v. Litvak*, No. 3:13-CR-19 JCH, 2013 WL 5740891, at *2 (D. Conn. Oct. 21, 2013) (citing *Russell v. United States*, 369 U.S. 749, 764–65 (1962); *United States v. Pirro*, 212 F.3d 86, 93 (2d Cir. 2000))

## II. THE SECOND CIRCUIT'S DECISION IN *COUNTRYWIDE* NEGATES ANY POSSIBLITY OF MAIL OR WIRE FRAUD IN THIS CASE

When the Court wrote its Verdict on June 6, 2016, it did not have the benefit of the Second Circuit's scholarly decision discussing the history of the Mail and Wire Fraud statutes in *United States v. Countrywide,* 822 F.3d 650 (2d Cir. 2016), the Eleventh Circuit's description and adoption of Second Circuit law in *United States v. Takhalov,* 827 F.3d 1307 (11th Cir. 2016) or the now-famous Seventh Circuit decision limiting Mail and Wire Fraud between sophisticated parties in negotiating a contract in *United States v. Weimert,* 819 F.3d 351 (7th Cir. 2016). The Court also did not have the benefit of *United States v. Litvak,* 889 F.3d 56 (2d Cir. 2018) ("*Litvak II*" June 2018), which led the Court to granting a Rule 33 New Trial Order for Michael Gramins, who was the co-defendant of Ross Shapiro in the famous securities fraud case of *United States v. Shapiro,* No. 15-cr-155. On the same day that *Litvak II* was issued by the Second Circuit, a jury also acquitted David Demos for the similar charge of lying to his clients on Wall Street. *See United States v. Demos,* No. 16-cr-220. Therefore, there is a good argument to be made that both this Court and the Second Circuit have now recognized that lies done in the negotiations of contracts or commercial transactions are not enough to trigger the Mail and Wire Fraud statutes. See above where this Court says exactly that in its ruling in *Shapiro*, which led to the acquittal in *Demos*.

These cases are all important because the allegations in Petitioner's December 2013 Indictment, which was dismissed, are that he was the leader of a "scheme to defraud" numerous insurance companies by inducing them to issue so-called "STOLI" (Stranger-Originated Life Insurance) policies by deceiving them about the true nature of the Charter Oak Trust. But, it is not disputed that Petitioner did not fill out, sign, or send in any of the applications for the Charter Oak Trust, nor was he the Trustee or the Insurance Trustee of the Charter Oak Trust. His only

involvement in this affair was that his company Grist Mill Capital funded the policies that were purchased by the Charter Oak Trust through a fully-disclosed Split-Dollar Arrangement, which if the carriers did not know about, then certainly their agents did and it is an age old maxim that "knowledge of the agent is knowledge of the carrier." *See Stipcich v. Metropolitan Life,* 277 U.S. 311 (1928). Therefore, Petitioner and his company Grist Mill Capital are like the investors in *Binday* and *AEI v. Lincoln* who were not charged, and also like the investors in *Quatrella* who were declared to be the "victims" of the fraud because they lost money while the carrier made money, exactly as happened in this case. The evidence produced at Petitioner's trial showed without a doubt that the carriers were paid over $100 million for the alleged STOLI policies, and at the end of the day, Petitioner's company Grist Mill Capital lost over $74 million. These sums have been audited several times by both the IRS in audits and Petitioner's accountants and submitted to both Judge Underhill and Judge Vatti. Judge Underhill has already ruled in Petitioner's favor and the Government filed its proof in compliance of Judge Underhill's order in October 1, 2021. Furthermore, the only losses in this case were sustained by Petitioner and his company Grist Mill Capital, which is currently in front of the Honorable Judge David Vatti. *See Mediation Statement by Grist Mill Capital, LLC,* for the Fourth Amendment violations for the Raid of May 26, 2011, Attached as Exhibit 1.

Therefore, after the Second Circuit's decision in *Countrywide,* where there was a massive fraud involving billions of dollars of worthless mortgages purchased by Fannie Mae, it is difficult to see how there can be any fraud in the Charter Oak Trust which paid millions of dollars in actuarially calculated premiums to the insurance carriers who were the alleged "victims" in the this case. The now-famous *Countrywide* decision by the Second Circuit was largely based on two seminal cases from the First Circuit, which Petitioner has cited many times

in his Boston case: *McEvoy Travel v. Heritage Travel,* 904 F.2d 786, 791-92 (1st Cir. 1990) ("the common law requires proof--other than the fact of breach-that, at the time a contractual promise was made, the promisor had no intent ever to perform the obligation.") *Countrywide* at 660, and *Sanchez* v. *Triple-S,* 492 F.3d 1, 11 (1st Cir. 2007), stating:

> **A defendant's failure to disclose information, without more, cannot make out a violation of the mail and wire fraud statutes**. *See, e.g., United States* v. *Autuori,* 212 F.3d 105, 118 (2d Cir. 2000)....We nevertheless observed that "[i]t would be a truly revolutionary change to make a criminal out of every salesman (assuming the use of the mails or telephone) who did not take the initiative to reveal negative information about the product and who-a jury might find-secretly harbored in his heart the hope that the buyer would never ask." *Id.* (emphasis added).

The Second Circuit posited the central issue in *Countrywide* as what constitutes fraud in the case of a contract and illustrates the fundamental difference between a mere breach of contract and a fraud: the intention of the breaching party to perform at the time of entering into the agreement, as opposed to a contracting party who never intended to perform at the outset (which is fraud). *Id.* at 656. The Second Circuit noted that "[t]his question, not an unusual one at common law, poses a novel issue in the context of the federal fraud statutes before us. Supreme Court precedent instructs us to apply the common-law understanding of fraud principles to these statutes, absent inconsistency with their text." *Countrywide* at 656. The Second Circuit's observation that the issue is "novel" satisfies the requirement that a motion to vacate a conviction may be based on an intervening change in the law. The Second Circuit then embarked upon an analysis of the common law's treatment of fraud claims based upon breaches of contract, citing several famous cases in its analysis of the history of mail and wire fraud.

In *Countrywide,* the Second Circuit evaluated "what is required to prove a scheme to defraud when alleged misrepresentations concerning future performance are contained within a contract?" *Countrywide* at 658. The Court concluded that a "scheme to defraud" requires proof

of the intent not to perform the contract at the time of its execution where the alleged misrepresentation was contained in the agreement itself. *Id.* at 662. Where there is not an intent not to perform one's obligations under the contract at the time of executing the same, a subsequent breach of the contract, even if willful and malicious, is not tortious and does not constitute fraud for purposes of the mail or wire fraud statutes. The legal standard in *Countrywide* was only by a "preponderance of the evidence", whereas in Petitioner's case it was beyond a reasonable doubt.

In analyzing the history of the mail and wire fraud statutes and citing *Durland v. United States*, 161 U.S. 306, 313 (1896), the Second Circuit buttressed its point: a "scheme to defraud" requires "intent and purpose." *Countrywide* at 662. Moreover, the scheme must be "designed to *induce* reliance on a known misrepresentation." *Id.* In other words, the proponent of the representation must know that he or she is lying or intentionally omitting necessary information. Accordingly, courts look to the individual's intent at the time the representation is made and not when the counterparty relied on it or was injured by it. "Only if a contractual promise is made with no intent ever to perform it can the promise itself constitute a fraudulent misrepresentation." *Id.* Obviously, the only promise made in this case, the promise to pay the premium charged by the carriers, was kept. The Government knows that the Carriers were paid the full premiums charged by each Carrier for each insured as described by the Second Circuit in *AEI Life LLC v. Lincoln Ben. Life Co.*, 892 F.3d 126 (2d Cir. 2018).

The Second Circuit further emphasized **that regardless of how serious, intentional, or malicious the breach, it is not fraudulent, absent that intention not to perform on the promise when it was made.** *Id.* at 661 (emphasis added). To hold to the contrary, the court explained, would vitiate the common law's tolerance and encouragement of "efficient breaches."

*Id.* In other words, common law gave parties to a contract two choices: either comply with the obligations of a contract or breach it and answer in damages. Therefore, the Second Circuit held that breaches of contract do not constitute a "scheme to defraud" under the mail and wire fraud statutes, absent a fraudulent intent at the time the contract is made or later fraudulent misrepresentations. *Id.* at 661–62.

The Second Circuit, after reviewing the Supreme Court precedent contained in *Durland v. United States*, 161 U.S. 306 (1896) and related cases, along with the history of the Common Law and the fraud statutes, found no difficulty in holding that "[w]hat fraud in these instances turns on, however, is *when* the representations were made and the intent of the promisor *at that time*. . . . where allegedly fraudulent misrepresentations are promises made in a contract, a party claiming fraud must prove fraudulent intent at the time of contract execution; evidence of a subsequent, willful breach cannot sustain the claim." *Countrywide* at 658. The Second Circuit then summarized its holding as follows: "a contractual promise can only support a claim for fraud upon proof of fraudulent intent not to perform the promise at the time of contract execution. Absent such proof, a subsequent breach of that promise—even where willful and intentional—cannot in itself transform the promise into a fraud." *Id.* at 662. Put another way:

> Accordingly, we deem the common law's contemporaneous fraudulent intent principle incorporated into the federal mail and wire fraud statutes. Applying these principles to a fraud claim based on the breach of a contractual promise, we conclude that the proper time for identifying fraudulent intent is contemporaneous with the making of the promise, not when a victim relies on the promise or is injured by it. *Only if a contractual promise is made with no intent ever to perform it can the promise itself constitute a fraudulent misrepresentation. Id.* (emphasis added).

Suffice it to say, if there was no Mail and Wire Fraud in the billions of dollars of fraudulent mortgages purchased by FNMA that cost the American Taxpayer even more billions to bail out the banks and FNMA, then clearly there can be no fraud in the case.

## III. THIS COURT'S VERDICT DOES NOT COMPORT WITH WELL-ESTABLISHED PRECEDENTS OF THE SECOND CIRCUIT

The Court also did not have the benefit of the detailed opinion from the Eleventh Circuit in *Takhalov*, describing and thereby adopting the law of the Second Circuit as to what is required for there to be a violation of the Mail and Wire Fraud statutes. Deceit is not enough; there must be an actual intent to harm the victim of the deceit. To explain this fine but vital distinction in the law, the Eleventh Circuit uses what might be called the "Parable of the Deceitful Neighbor" to explain its position. Most recently, the Second Circuit has made it abundantly clear that not only must there be more than deceit in a Mail and Wire Fraud case based on the Right to Control Theory of Fraud, there must also be "intended" demonstrable "tangible economic harm" to the victim before somebody can be held accountable under the Mail and Wire Fraud Statutes. *See Finazzo* at 111 *citing Mittelstaedt* at 1216-17. In *Finazzo*, the Second Circuit uses its own parable to teach its lessons concerning the Mail and Wire Fraud statutes by stating that if an apparel company did not wish to be involved with overseas child labor, and a supplier lied about their non-involvement in child labor, that would be deceit but it would not impact the economics of the benefit of the bargain, which would be based on the quality, the amount, and the cost of the goods. So, unless the lie or the deceit was meant to cause "tangible economic harm" to the alleged victim, it is doubtful that the Mail and Wire Fraud statutes would apply according to the Second Circuit. This is particularly true in the accusations in Petitioner's case, because no one disputes that the STOLI policies have been profitable to the carriers, the only risk that bothered the carriers was the reputational risk of STOLI (like child labor) and it is only Petitioner's company that lost money because of the lies of the carriers' own brokers. More importantly, it is an ancient axiom of the law that the "knowledge of the agent is the knowledge of the carrier." *See, e.g., Stipcich v. Metropolitan Life,* 277 U.S. 311 (1928).

For that reason, the Eleventh Circuit in *United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016) is particularly important to Petitioner's motion to vacate a wire fraud conviction decided after the Court's June 6, 2016 Verdict, the Eleventh Circuit gives a detailed historical analysis of the Second Circuit's interpretation of the mail wire fraud statutes and adopts the Second Circuit's interpretation of what constitutes a "scheme to defraud" as opposed to a "scheme to deceive" for its own uses to define that requirement under the Federal statutes. *See Takhalov*. If the Eleventh Circuit's analysis of the Second Circuit's law is correct, then the decision in *Takhalov* calls into question this Court's determination of any scheme to defraud the carriers, much less one carried out by the Petitioner.

In order to explain the difference between a "scheme to defraud" which is illegal under the wire fraud statute, and a "scheme to deceive" which may be morally wrong but is not conduct prohibited by the mail and wire fraud statutes, the Eleventh Circuit in *Takhalov* uses what might be called the "Parable of the Deceitful Neighbor." The Eleventh Circuit describes two scenarios. In the first, a man calls his neighbor saying that his child is very ill, and the neighbor responds by rushing over to see if she can help. The man asks her to give him change for a dollar, which the helpful neighbor gladly gives him. She later learns that the neighbor's child was not sick at all. The second scenario is identical to the first, except that now the Deceitful Neighbor gives the woman a counterfeit dollar in exchange for the four quarters. The Eleventh Circuit carefully explains why the first scenario is not wire fraud, but the second one is, despite the fact that the woman would not have rushed over in the first scenario had she known that the child was not really sick.

Petitioner's indictment clearly fails to articulate any particular "scheme to defraud" because the very facts of the case belie the existence of any "scheme to defraud" by anyone, but

especially Petitioner who did not lie to anyone about anything at any time. The Verdict suffered from the same defects and, in fact, the word lie as applied to Petitioner is found only on Page 56 of the verdict, where the Court states the following:

> "The defendant testified that he never told anyone to lie on the applications. The defendant might not have uttered the word "lie" when instructing others. But there is credible evidence that others lied when completing applications because he told them to do so." Page 56, FN43

Even deceitfully breaching a contract is not a crime per se; something more than "deceit" is required to make a case for mail and wire fraud. *See, e.g., United States v. Shellef*, 507 F.3d 82, 107-9 (2d Cir. 2007), *United States v. Starr*, 816 F.2d 94 (2d Cir. 1987), *United States v. Regent Office Supply Co.*, 421 F.2d 1174 (2d Cir. 1970); all of which are cited above in *Takhalov* by the Eleventh Circuit describing the law of mail and wire fraud in the Second Circuit. If the alleged deceit merely and solely causes the victim to enter into a contract that they would not normally enter, that is merely a "scheme to deceive" and not an illegal scheme to defraud. *Takhalov* at 1314, *citing Shellef* at 108 and *Starr* at 98.

Petitioner's indictment is filled with speculation about how STOLI policies might affect insurance carriers, speculation by the government that is not just specious, but has been proven false in numerous civil lawsuits, and theories about possible fraud, but there is no specific claim of actual fraud, or allegations that Petitioner intended any of the Carriers to suffer any "actual concrete" harm, which is the sine qua non of mail and wire fraud, and Petitioner certainly did not intend for anyone to lose money or be harmed. *See, e.g., United States v. Rossomando*, 144 F.3d 197 (2d Cir. 1998) (mail fraud conviction vacated because there was no proof that the defendant intended any harm to the victim so that the defendant's good faith was unimpaired despite the jury's verdict). See the dispositive quote from *Takhalov* about harm:

From that conclusion, a corollary follows: a schemer who tricks someone to enter into a transaction has not "schemed to defraud" so long as he does not intend to harm the person he intends to trick. And this is so even if the transaction would not have occurred but for the trick. For if there is no intent to harm, there can only be a scheme to *deceive*, but not one to *defraud*. *Takhalov* at 1313.

In determining the difference between a "scheme to defraud" and a mere "scheme to deceive" which is not illegal, the Eleventh Circuit has adopted the Second Circuit's interpretation of the law stating that "a schemer who tricks someone to enter into a transaction they would not have entered into has not "schemed to defraud" so long as he does not intend to harm the person that he intends to trick." Thus, deceiving is a necessary condition of defrauding but not a sufficient one. Put another way, one who defrauds always deceives, but one can deceive without defrauding. This is so even if the transaction had not occurred but for the trick. For if there is no intent to harm, there can only be a "scheme to deceive, but not one *to defraud*." (Emphasis in original) *See Takhalov* at 1313-14.

Because the *Takhalov* case involves "Bar-Girls" luring businessmen and tourists to the bar to buy them drinks, the Eleventh Circuit in its example of the difference between a "scheme to deceive and a "scheme to defraud" distinguishes between a high-end rare premium bourbon whisky and a cheap bar brand. The fact that the bar-girl works for the bar does not matter because the businessman got what he bargained for which is the opportunity to buy a pretty young woman a drink. That is merely a scheme to deceive. But, if they substituted a cheap whisky for an expensive whisky or added bogus charges to the credit card bill, that may be a scheme to defraud. Once again, based on the Parable of the Deceitful Neighbor, the fact that the Deceitful Neighbor gave her a real dollar for the four quarters was merely a scheme to deceive; whereas in the scenario where he gives her a counterfeit dollar, that is wire fraud because he intended to harm and obtain her real four quarters in exchange for the bogus dollar and he used

the phone to deceive her. Therefore, he has now committed a "scheme to defraud" with the intent to harm someone and obtain their money or property through trickery or deceit, utilizing the wires of the phone call.

To be a "scheme to defraud" the schemer must also make a misrepresentation that is material to the very nature of the bargain. This is important to Petitioner's case because the *Binday* scheme, upon which his indictment was based, was merely a scheme to deceive in that any misrepresentations were merely to induce the insurance carriers to issue the policies. In Petitioner's case, there was no proof at trial that Petitioner lied or deceived anyone, unlike in *Binday* where the defendants admitted up front that they had misrepresented certain answers on the insurance applications; and Petitioner still believes the questions at issue to prevent STOLI policies were answered truthfully and accurately on the applications filled out by other people for the Charter Oak Trust. Once again, unlike the Deceitful Neighbor in *Takhalov*, Petitioner did not lie to anyone about anything at any time. In fact, the Court's Verdict correctly refers to witnesses' testimony regarding Petitioner's firmly-held belief in the differences between Split-Dollar funding arrangement and premium financing, in the context of the insurance industry. See Verdict at 44. If at this late date, we can still debate over what is Split-Dollar and what is premium financing, then Petitioner's case is not even one of a "scheme to deceive" like *Takhalov*, much less a "scheme to defraud", which is required under the mail and wire fraud statutes to be a crime in the Second Circuit.

Just as the STOLI fraudsters in *AEI v. Lincoln*, at no time did the *Binday* defendants lie about gender, age, or health, nor is that alleged in Petitioner's indictment as required by *Neder v. United States*, 527 U.S. 1 (1999). The only misrepresentations that the *Binday* defendants made were about the reason for purchasing the insurance or the wealth of the insured, just like the

Deceitful Neighbor lied about his child being ill, but the *Binday* defendants did not lie about the essential elements of the life insurance bargain which are gender, age, and health. In Petitioner's case, there was no evidence adduced at all at trial to show that Petitioner lied about anything to anyone, and the alleged lies by the brokers harmed Petitioner and his company Grist Mill Capital, not the carriers that the brokers worked for and were paid commissions by.

But, just as in *AEI v. Lincoln*, there were no allegations in Petitioner's Superseding indictment or evidence produced at trial that anyone, including Petitioner lied about the essential elements of the insurance bargain, which are Age, Gender, and Health. Even J. Edward Waesche, Bruce Mactas, Robert Pacini, Charles Induddi-Westcott, and Ezekiel Lambert only lied about wealth and not the age, health, or gender of their insurance clients. (See, e.g., Ezekiel Lambert's testimony at Tr. Vol. VII, p. 1277 at *20-21). If lying about the reason you want a $10 million insurance policy is a crime, then the government should have indicted Mr. Lambert and his mother and not Petitioner. But, it is also clear from his testimony that Mr. Lambert lied to the IRS on his father's estate tax audit, not to the carrier or on the Grist Mill Capital forms, because if his family estate was really only $12 million instead of the $18 million-plus he put on the Charter Oak Trust and Grist Mill Capital forms, then he did not really need a $10 million policy on "Momma" after all. Mr. Lambert's fraud alone cost Grist Mill Capital over $1.3 million in premiums paid due to his fraud on the Charter Oak Trust. So, Ezekiel Lambert was an example of the "Deceitful Neighbor" in this case, not Petitioner

In describing and adopting the law of the Second Circuit as its own as to the difference between a "scheme to deceive" which is not criminal, and a "scheme to defraud" that is prohibited by the mail and wire fraud statutes, the Eleventh Circuit stated the following in *Takhalov*:

The Second Circuit has interpreted the wire-fraud statute in precisely this way. Their cases have "drawn a fine line between schemes that do no more than cause their victims to enter into transactions that they would otherwise avoid—which do not violate the mail or wire fraud statutes—and schemes that depend for their completion on a misrepresentation of an essential element of the bargain—which do violate the mail and wire fraud statutes." *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007); *see also United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987) ("Misrepresentations amounting only to a deceit are insufficient to maintain a mail or wire fraud prosecution. Instead, the deceit must be coupled with a contemplated harm to the victim [that] affect[s] the very nature of the bargain itself. Such harm is apparent where there exists a discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered, or intended to deliver.") (internal quotation marks omitted); *United States v. Regent Office*, 421 F.2d 1174, 1182 (2d Cir. 1970) ("[W]e conclude that the defendants intended to deceive their customers but they did not intend to defraud them, because the falsity of their representations was not shown to be capable of affecting the customer's understanding of the bargain nor of influencing his assessment of the value of the bargain to him, and thus no injury was shown to flow from the deception."). Moreover, the Second Circuit's interpretation of the wire-fraud statute is not a parochial interpretation of an ambiguous provision of federal law. Their interpretation follows as a matter of logic from Congress's decision to use the phrase "scheme to defraud" rather than "scheme" or "scheme to deceive." We therefore adopt that interpretation as our own. A jury cannot convict a defendant of wire fraud, then, based on "misrepresentations amounting only to a deceit." *Shellef* at 108. Thus, even if a defendant lies, and even if the victim made a purchase because of that lie, a wire-fraud case must end in an acquittal if the jury nevertheless believes that the alleged victims "received exactly what they paid for." *Takhalov* at 1314-15, citing *Shellef* at 108.

This statement by the Eleventh Circuit describing the law of the Second Circuit conforms to other case law emanating from the Second Circuit that without the "intent to harm" there can be no scheme to defraud. *See, e.g., United States v. Rossomando*, 144 F.3d 197, 201 (2d Cir. 1998) (conviction for Mail Fraud reversed because government failed to prove that the defendant actually intended and contemplated "concrete harm" to the pension fund). *See, also, Finazzo* at 111 *citing Mittelstaedt* at 1216-17 that the intended harm must be "tangible economic harm."

Therefore, based on the Eleventh Circuit's description of the law of Mail and Wire Fraud in the Second Circuit, and a "scheme to deceive" versus a "scheme to defraud", it is clear that the scheme in *Binday* was one to deceive and not defraud as described in the Supreme Court's famous cases such as *Neder* and *Skilling v. United States*, 561 U.S. 358 (2010). Since the

Superseding Indictment in Petitioner's case is a virtual carbon copy of the indictment in *Binday*, and because the government has failed to demonstrate, much less prove beyond a reasonable doubt any "scheme to defraud" knowingly joined by Petitioner with the intent to deceive with "material" misrepresentations to cause some actual "tangible economic harm" to some carrier, this Court should grant Petitioner's Motion and Vacate the Court's June 6, 2016 Verdict and its December 3, 2018 Judgment, as they clearly do not comport with the well-established law of the Second Circuit as to what is required for there to be a violation of the Mail and Wire Statutes and then Dismiss with prejudice the Superseding Indictment of May 14, 2014, for failure to state all of the essential elements of Mail and Wire Fraud Statutes in the Indictment..

## IV. RECENT DECISIONS IN OTHER CIRCUITS WARRANT GRANTING RELIEF IN THIS CASE

Similar to the Second Circuit's decision in *Countrywide*, and the Eleventh Circuit's decision in *Takhalov*, the Seventh Circuit's decision in *United States v. Weimert*, 819 F.3d 351 (7th Cir. 2016) has been cited in hundreds of articles across the country for its analysis of the mail and wire fraud statutes. *See, e.g., When Do Business Negotiations Cross the Line and Become Fraud?*, New York Law Journal, Abramowitz, E. and Sack, J., May 5, 2016.

In *Weimert*, the Seventh Circuit reversed a banker's conviction for mail and wire fraud because they felt the materiality element of the federal fraud statutes was being stretched too far "to criminal deception about a party's negotiating positions." *Weimert* at 357. While it is clear that Weimert did lie to parties on both sides of a transaction to purchase a property from Anchor Bank, those lies actually caused Anchor Bank to pay him a large bonus so that he could purchase his equity stake in the property that he was in charge of selling for Anchor Bank, and also caused the purchaser to pay more than they would have, had Mr. Weimert not been involved. Once again, unlike Petitioner, it is undisputed that Mr. Weimert lied to both his employer – the Seller – and to his future "partner" – the Purchaser – in this transaction, and clearly his lies caused his "partner" to pay more than they needed to, but also "harmed" his employer by the amount of the bonus that went into Weimert's pocket and the diversion of proceeds from the increased cost. For his negotiation deceptions, and for inserting himself in the transaction, Mr. Weimert was indicted on six counts of wire fraud and found guilty of five counts by the jury in the district court.

In reversing Weimert's conviction the Seventh Circuit declared that the mail and wire fraud statutes had been stretched "far beyond where they should go." *Id.* at 355. The court then itemized four ways that the mail and wire fraud statutes had been stretched too far:

First, information about a party's negotiating position is surely material in the sense that it is capable of influencing another party's decisions. Second, actionable deception can include false statements of fact, misleading half-truths, deceptive omissions, and false promises of future action. All of these descriptions may fit deceptions about negotiating positions, at least if a negotiator's present state of mind is treated as a fact. Third, the false statement may be made to someone other than the owner or holder of the money or property targeted by the scheme. And fourth, it is no defense that the intended victim either trusted the defendant too much or was too savvy to be fooled. *Id.* at 357.

The Court then states that: negotiating parties "do not expect complete candor about negotiating positions, as distinct from facts and promises of future behavior." *Id.* at 358. Thus, the Seventh Circuit held that "deception about negotiating positions – about reserve prices and other terms and their relative importance – should not be considered material for purposes of mail and wire fraud statements." *Id.* The mail and wire fraud statutes do not cover all behavior which strays from the ideal." *Id.* at 357. Once again, Petitioner is not accused in the original indictment or the superseding indictment of lying to anyone, but rather being in an alleged conspiracy with other people who are claimed to have made misrepresentations on various insurance applications. But, as the Court said itself during the trial, if Petitioner had known that agents and brokers like Mr. Waesche were lying to him, then Petitioner would have terminated them. See T. Tr. Vol. VI, p. 1193 at *17-21.

Unlike in *Weimert*, Petitioner was not accused of lying in the insurance transaction. In fact, it was the agents and brokers, like Mr. Waesche, that were acting as the go-between. It was Mr. Waesche that lied to Penn Mutual (the Seller) and Petitioner's company Grist Mill Capital (the Purchaser through the Charter Oak Trust) for his own gain. Thus, it is Mr. Waesche who is the "Weimert" of this case, not Petitioner. Based on the Seventh Circuit's decision in *Weimert*, Petitioner should not have been indicted in the first place, and Mr. Waesche should get new attorneys to revoke his guilty plea. Mr. Waesche's lies and misrepresentations did not harm the carriers; they only harmed Grist Mill Capital. Petitioner did not lie or misrepresent anything to

anyone, much less make a "material" misrepresentation as required by *Neder* and *Weimert*. In *Weimert*, Mr. Weimert's lies caused the Purchaser to pay more and the Seller to get less then had he not inserted himself (especially with the big bonus he required from the Bank), but the Seventh Circuit's opinion – just like the Eleventh Circuit's opinion in *Takhalov* – demonstrates that proving fraud requires evidence of more than just sharp, or even distasteful, business practices, and that a "scheme to defraud" requires intent to deceive, about a material and essential element of the deal, and contemplated harm to the victim. Whether by affirmative misrepresentation, omission, or failure to correct a counterparty's mistaken belief, fraud requires a deception of an essential element of the bargain. Without such deceit, fraud does not exist in the common law, or under the mail and wire fraud statutes. In Petitioner's case, he did not fill out any applications nor did he lie to anyone, and unlike the defendants in *Binday*, he has not admitted to lying to anyone about anything, and no one has accused him of lying about an essential element of the insurance contract, i.e. age, gender, or health.

Additionally, this Court did not have the benefit of two other recent landmark cases from the First Circuit limiting the mail and wire fraud statutes, requiring that the mailings and wires be in furtherance of the fraud. *See Tavares* (in reversing RICO and mail fraud convictions and ordering the entry of judgments of acquittal) held that while "[t]he 'in furtherance' requirement is to be broadly read and applied," *id.* at 58, the requirement "places an important limitation on federal authority." *Id.* (citing *Kann v. United States,* 323 U.S. 88, 95 (1944)). Furthermore, this Court did not have the benefit of the First Circuit's overturning the *See, e.g.,* the First Circuit's recent decisions in *United States v. Tavares,* 844 F.3d 46, 59 (1st Cir. 2016):

*See, e.g.,* the First Circuit's recent decisions in *United States v. Tavares,* 844 F.3d 46, 59 (1st Cir. 2016):

Even assuming that there was a "scheme to defraud," the government did not present substantial evidence of a mailing "in furtherance of" such a scheme. *Hebshie*, 549 F.3d at 35-36. The government points to form rejection letters that OCP staff mailed to unsuccessful applicants, typically after the final candidates were selected, to satisfy the mailing requirement. The defendants contend that all letters were nevertheless mailed after the scheme reached its fruition. Regardless of the exact timing of the mailings, there is no evidence that the letters were material to the consummation of the defendants' scheme. *See Kann*, 323 U.S. at 94: "It was immaterial to [the defendants], or to any consummation of the scheme, how the bank which paid or credited the check would collect from the drawee bank. ("Congress could have drafted the mail fraud statute so as to require only that the mails be in fact used as a result of the fraudulent scheme. But it did not do this. . . ."). *Maze, supra* at 405 " *Tavares* at 59.

The First Circuit went on to say in *United States v. Berroa*, 856 F.3d 141, 150 (1st Cir. 2017) that "under the government's theory, any false statement in an application...could constitute a federal crime." But unlike the defendants in *Berroa*, Petitioner has not lied to anyone about anything in this case at any time.

As described above, neither Petitioner nor the Court had the benefit of the now-famous Seventh Circuit decision in *United States v. Weimert*, 819 F.3d 351 (7th Cir. 2016), where Weimert, a banker negotiating a deal to sell a property owned by his employer, a major bank, not only lied to his current employer the bank, but also lied to his future "partner" the real estate company and pocketed millions of dollars that he took from both his employer and his future partner. However, despite these falsehoods, in vacating Weimert's conviction, the Seventh Circuit made the following comments limiting the scope of the Mail and Wire Fraud statutes:

> Buyers and sellers negotiate prices and other terms. To state the obvious, they will often try to mislead the other party about the prices and terms they are willing to accept. Such deceptions are not criminal.

> To take a simple example based on price, suppose a seller is willing to accept $28,000 for a new car listed for sale at $32,000. A buyer is actually willing to pay $32,000, but he first offers $28,000. When that offer is rejected and the seller demands $32,000, the buyer responds: "I won't pay more than $29,000." The seller replies: "I'll take $31,000 but not a penny less." After another round of offers and demands, each one falsely labeled "my final offer," the parties ultimately agree on a price of $30,000. Each side has gained from deliberately false misrepresentations about its negotiating position. Each has

affected the other side's decisions. If the transaction involves interstate wires, has each committed wire fraud, each defrauding the other of $2,000? Of course not. But why not? The...answer is that negotiating parties, and certainly the sophisticated businessmen in this case, do not expect complete candor about negotiating positions, as distinct from facts and promises of future behavior. Deception about negotiating positions—about reserve prices and other terms and their relative importance—should not be considered material for purposes of mail and wire fraud statutes. *Weimert* at 357-58.

In commercial negotiations, it is not unusual for parties to conceal from others their true goals, values, priorities, or reserve prices in a proposed transaction. When we look closely at the evidence, the only ways in which Weimert misled anyone concerned such negotiating positions. He led the successful buyer to believe the seller wanted him to have a piece of the deal. He led the seller to believe the buyer insisted he had a piece of the deal. All the actual terms of the deal, however, were fully disclosed and subject to negotiation. There is no evidence that Weimert misled anyone about any material facts or about promises of future actions. *Id.* at 354.

The mail and wire fraud statutes do not cover all behavior which strays from the ideal....[W]e know of no other case in which a court has found that deceptive statements about negotiating positions amounted to a scheme to defraud under the mail or wire fraud statutes. *Id.* at 357-58.

In the end, the Seventh Circuit determined that Weimert's dealings in selling the Chandler Creek property were "sharp and self-interested, but they did not amount to wire fraud....[A]ll terms of the deal were on the table. [They] might have been able to secure a better deal if it had known the underlying priorities of prospective buyers and Weimert, but that is . . . a matter for the corporate boardroom and civil law, not a federal criminal trial." *Id.* at 370.

Just as the Second Circuit reviewed the history of the mail and wire fraud statutes in *Countrywide*, and the Eleventh Circuit reviewed the history in *Takhalov*, and the Seventh Circuit review that history in *Weimert*, so, too, did the Sixth Circuit examine that same history to conclude that property for the purposes of the mail and wire fraud statutes does not include "a right to accurate information", or what might be referred to in the Second Circuit as the "right to control theory" of fraud, where a company is being deprived of information that would have affected their economic decision making. *See United States v. Sadler*, 750 F.3d 585, 590 (6th

Cir. 2014). In *Sadler*, Nancy Sadler's conviction for wire fraud was reversed despite the fact that she lied to pharmaceutical companies about the reasons why she was buying large quantities of drugs. She and her husband were convicted of running a pill mill, but her conviction for wire fraud was vacated because she paid full price for the drugs and her lies as to why she wanted the drugs were not just "immaterial" to the bargain, the deceit and lies did not constitute depriving the victims of money or property or creating pecuniary losses as required by the mail and wire fraud statutes because she paid full price for the pills.

> But paying the going rate for a product does not square with the conventional understanding of "deprive." *United States v. Cleveland*, 531 U.S. 12, 19 (2000). Stealing the pills would be one thing; paying full price for them is another. Case law reinforces that the conventional meaning of "deprive" applies in the fraud context. To be guilty of fraud, an offender's "purpose must be to injure," *Horman v. United States,* 116 F. 350, 352 (6th Cir. 1902), a common-law root of the federal fraud statutes, *see Neder v. United States,* 527 U.S. 1, 21–25 (1999); Restatement (Second) of Torts §531 ("**One who makes a fraudulent misrepresentation is subject to liability for pecuniary losses suffered.**"). Nancy may have had many unflattering motives in mind in buying the pills, but unfairly depriving the distributors of their property was not one of them. As to the wire-fraud count, she ordered pills and paid the distributors' asking price, nothing more.
>
> As an alternative, the government offers another potential deprivation: Nancy's lies convinced the distributors to sell controlled substances that they would not have sold had they known the truth.Nancy in other words deprived the companies of what might be called a right to accurate information before selling the pills. To support this theory, the government points to the testimony of one distributor's representative, who said she would have been "concern[ed]" had she known more about Nancy's operation.
>
> That silence also requires us to pick the more lenient reading of the wire fraud law. "**[W]hen there are two rational readings of a criminal statute, one harsher than the other, we are to choose the harsher only when Congress has spoken in clear and definite language.**" *McNally* at 359–60. "Money," "property" and "the intangible right of honest services" clearly and definitely fall within the fraud statutes' scope, 18 U.S.C. §§1343, 1346, but other interests—such as the right to accurate information—do not. **Without more, we must conclude that the distributors' truth-in-purchasing concerns do not support a federal criminal conviction**. *Sadler* at 590-92 (emphasis added).

## V. THE SUPREME COURT'S UNANIMOUS DECISION IN *KELLY* REQUIRES THE DISMISSAL OF PETITIONER'S INDICTMENT

Just as the Supreme Court's decision in *Cleveland* led to the grant of a Writ of Coram Nobis by the Eleventh Circuit in *Peter*, so too should this Court grant this Petition, vacate Petitioner's Conviction and dismiss Petitioner's Indictment based on the fact that the Supreme Court in *Kelly* thoroughly dismantled the "Right to Control" theory of fraud advanced by the Government in that case as well as in Petitioner's case, based on the erroneous decision in *United States v. Binday*, 804 F.3d 558 (2d Cir. 2015). In supporting other Supreme Court precedent that reversed convictions based on intangible rights, the Supreme Court stated that:

> "If U.S. Attorneys could prosecute as property fraud every lie [someone] tells in making such a decision, the result would be-as *Cleveland* recognized-"a sweeping expansion of federal criminal jurisdiction." *Id.* at 24. And if those prosecutors could end-run *Cleveland* just by pointing to the [] incidental costs, the same ballooning of federal power would follow. In effect, the Federal Government could use the criminal law to enforce (its view of) integrity in broad swaths of [activities]. The property fraud statutes do not countenance that outcome. **They do not "proscribe[] schemes to defraud citizens of their intangible rights to honest and impartial government".** *Kelly v. United States*, 140 S.Ct. 1565, 1573-74 (2020), *quoting McNally* at 355.

In fact, in *Kelly*, the Supreme Court cites *United States v. Walters*, 997 F.2d 1219, 1224 (7th Cir. 1993), where in dismissing the indictment that case, Judge Easterbrook stated:

> "A [e-mails] B an invitation to a surprise party for their mutual friend C. B drives his car to the place named in the invitation," thus expending the cost of gasoline. *Id.* "But there is no party; the address is a vacant lot; B is the butt of a joke." *Id.* Wire fraud? No. And for the reason Judge Easterbrook gave: "[T]he victim's loss must be an objective of the [deceitful] scheme rather than a byproduct of it. *Id.* at 1226." *Kelly* at 1567, n.7.

The Supreme Court decision in *Kelly* discussed how the defendants committed a despicable act that should be condemned politically and actually did lead to Governor Christie falling in the polls, but also went on to say it was not a property crime nor did it cost citizens money or property, and therefore could not be prosecuted as mail or wire fraud. The First Circuit came to same decision in the case of *United States v. Bravo-Fernandez*, 913 F.3d 244 (1st Cir.

2019), where it vacated the conviction of the defendants for the government's failure to prove

only one of the essential elements of the crime under 18 U.S.C. §666 because:

> the government was required to establish that…the Commonwealth of Puerto Rico, received at least $10,000 in federal "benefits" within the meaning of that statute. The government did not meet this burden. Accordingly, we must reverse defendants' convictions for federal program bribery…For the reasons explained above, we conclude that the government failed to establish an essential element of the crime it charged defendants with. We need not go further and hereby reverse Bravo's and Martínez's §666 convictions. We direct the district court to enter a judgment of acquittal on both charges. *Bravo-Fernandez* at 244, 250-51

In this case, not only were all of the insurance company premiums paid, there was never

any attempt to "obtain" any money or property from the Carriers. In fact, the goal was just the

opposite, which was to pay the Carriers the premiums that they had bargained for in the

numerous insurance contracts. Even more significant to Petitioner's claim that his Indictment

should be dismissed for failure to state a federal crime after than the unanimous Supreme Court

decision in *Kelly* that dispensed with the "Right to Control" theory of fraud is the Second

Circuit's decision in *AEI v. Lincoln*, 892 F.3d 126 (2018), which specifically supports that fact

that the Carriers were not cheated in this case because they received the actuarially-calculated

premium amounts that they charged:

> "Nevertheless, Lincoln received all the payments it was due under the contract, and it is not alleged that the application was fraudulent with regard to Fischer's health. Jacob, the broker, received a commission of approximately $100,000 for his efforts with respect to Fischer's policy and, although he was aware that agents are forbidden by law to share their commissions with clients, transferred $50,000 to Irving for acting as a "middleman." Although everyone involved feigned ignorance during his or her testimony that the district court found untrustworthy, **the district court found little reason to doubt that they all knowingly engaged in what was a STOLI scheme.**" *AEI* at 130.

> "Lincoln concedes that despite the fraud, the policy's premiums were calculated "based on the statistics that applied to this woman with respect to her age and other conditions," which Lincoln does not allege to be fraudulent, and it received all the "premiums that [its] actuary said should be applicable here." **In other words, Lincoln was not "cheated of premiums."** *Id.* (emphasis added).

It is beyond dispute that Petitioner did not fill out, sign, or send in any of the alleged fraudulent applications in this case, which were all sent by Agents of the Carriers in 2006-2008, thereby making the broadened Superseding Indictment of May 14, 2014 untimely. The Superseding Indictment of 2014 was "broadened" by adding the Money Laundering provisions based on the Sash Spenser Lincoln policies proceeds. Moreover, Lincoln, which was the alleged victim of $50 million of the total $58 million in "actual" losses never appeared in this Court to claim restitution despite having their executives testify at Petitioner's trial. In fact, just as the insurance executives testified in *Binday*, the life insurance carriers in this case considered death benefits to be a "cost of doing business" and not a fraud loss because they "received the full economic benefit of its bargain." *Binday* at 570. Thus, not only was there no intended loss or "intent to defraud" or an intent to seize real money or property from the Carriers as required by *Kelly*, the worst that the Government can say about Petitioner is that he did not disclose the financial documentation of Grist Mill Capital being a secured lender to the Charter Oak Trust. But, once again, not only is that allegation demonstrably false, if the Government's case is based on nondisclosure, then *Skilling* is directly on point because "Nondisclosure is outside the bounds of the fraud statutes." *Skilling* at 410. Therefore, just as a number of cases that have been recently dismissed based on *Kelly* (*see, e.g., Olan v. United States*, No. 20-306, Judgment Vacated January 11, 2021), and the defendant in *Peter* that had pleaded guilty to a crime and his conviction was vacated by granting a Writ of Coram Nobis based on *Cleveland*, Petitioner respectfully submits to this Court that his Conviction be vacated and his Superseding Indictment be dismissed based on the Supreme Court's unanimous decisions in both *Skilling* and most recently in *Kelly*.

## VI. THE FOURTH AMENDMENT VIOLATIONS IN THIS CASE REQUIRE VACTING THE CONVICTION AND DISMISSING THE SUPERSEDING INDICTMENT

While it is often repeated, Justice Brandeis' famous admonition in *Olmstead v. United States*, 277 U.S. 438, 485 (1928) is worth repeating here:

Decisions of this Court applying the principles of the *Boyd* case have settled these things. Unjustified search and seizure violates the **Fourth Amendment**, whatever the character of the paper; whether the paper when taken by the federal officers was in the home, **in an office**, or elsewhere; whether the taking was effected by force, by fraud, or in the orderly process of a court's procedure. From these decisions, it follows necessarily that the Amendment is violated by the officer's reading the paper without a physical seizure, without his even touching it, and that use, in any criminal proceeding, of the contents of the paper so examined -- as where they are testified to by a federal officer who thus saw the document, or where, through knowledge so obtained, a copy has been procured elsewhere -- **any such use constitutes a violation of the Fifth Amendment**.

The protection guaranteed by the Amendments is much broader in scope. **The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness.** They recognized the significance of man's spiritual nature, of his feelings, and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. **They conferred, as against the Government, the right to be let alone -- the most comprehensive of rights, and the right most valued by civilized men. To protect that right, every unjustifiable intrusion by the Government upon the privacy of the individual, whatever the means employed, must be deemed a violation of the Fourth Amendment**. And the use, as evidence in a criminal proceeding, of facts ascertained by such intrusion must be deemed a violation of the Fifth.

*Olmstead v. United States*, 277 U.S. 438, 485 (1928)(Brandeis, J., dissenting).

Both of the unlawful raids in this case were far worse than the seizure in *Boyd*, which the Supreme Court decried as the worse in American History. Each of the search warrants in this case was far more defective than the "glaringly" defective search warrants in *United States v. Benjamin Wey*, and *In re 650 Fifth Ave*, and this case even involved a "secret" subpoena by

AUSA Novick that was the exact same conduct deplored by the Supreme Court in *Silverthorne Lumber* and by Justice Brandeis in *Olmstead*, citing both *Silverthorne* and *Boyd*.

The Second Circuit has long held that if the search warrant is defective then the search is tantamount to a warrantless search and is *"per se"* unconstitutional. *See Zuniga-Perez v. Sessions*, 897 F.3d 114 (2d Cir. 2018), which states that "even where a warrant has been issued, law enforcement agents are bound by its terms because a warrant generally authorizes no more than what it expressly provides, to act unreasonably beyond the terms of a warrant is akin to acting without a warrant at all." *Id.* at 123, *citing Simon v. City of N.Y.*, 893 F.3d 83, 94 (2d Cir. 2018). *See, also, Massachusetts v. Sheppard*, 468 U.S. 981, 988, n.5 (1984) ("[A] warrant that fails to conform to the particularity requirement of the Fourth Amendment is unconstitutional.").

The intrusion into an office is therefore governed by the normal Fourth Amendment rule that "except in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant." *G.M. Leasing Corp. v. United States*, 429 U.S. 338, 358 (1977), *citing Camara v. Municipal Court*, 387 U.S. 523, 528-29 (1967). The Warrant Clause of the Fourth Amendment protects commercial buildings as well as private homes, and any opposition to that mandate could not be defended in light of the Supreme Court's clear holdings to the contrary. *See, e.g., See v. City of Seattle*, 387 U.S. 541 (1967); *Go-Bart Co. v. United States*, 282 U.S. 344 (1931); *Silverthorne Lumber Co. v. United States*, 251 U.S. 385 (1920). Nor can it be claimed that corporations are without some Fourth Amendment rights. *Go-Bart*; *Silverthorne*; *Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 205-06 (1946); *Hale v. Henkel*, 201 U.S. 43, 75-76 (1906). *Cf. California Bankers Assn. v. Shultz*, 416 U.S. 21 (1974); *Federal Trade Comm'n v. American Tobacco Co.*,

264 U.S. 298, 305-06 (1924); *Wilson v. United States*, 221 U.S. 361, 375-76 (1911); *Consolidated Rendering Co. v. Vermont*, 207 U.S. 541, 553-54 (1908).

To hold otherwise would belie the origins of the Fourth Amendment and the American experience. An important forerunner of the first 10 Amendments to the United States Constitution, the Virginia Bill of Rights specifically opposed "general warrants, whereby an officer or messenger may be commanded to search suspected places without evidence of a fact committed." The general warrant was a recurring point of contention in the Colonies immediately preceding the Revolution. The particular offensiveness it engendered was acutely felt by the merchants and businessmen whose premises and products were inspected for compliance with the several parliamentary revenue measures that most irritated the colonists. "[T]he Fourth Amendment's commands grew in large measure out of the colonists' experience with the writs of assistance…[that] granted sweeping power to customs officials and other agents of the King to search at large for smuggled goods." *United States v. Chadwick*, 433 U.S. 1, 7-8 (1977). *See, also, G.M. Leasing* at 355. Against this background, it is untenable that the ban on warrantless searches was not intended to shield places of business as well as of residence. *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 311-13 (1978). As Justice Sotomayor famously observed:

> "The Fourth Amendment was adopted specifically in response to the Crown's practice of using general warrants and writs of assistance to search "suspected places" for evidence of smuggling, libel, or other crimes. *Boyd v. United States*, 116 U.S. 616, 625-26 (1886). Early patriots railed against these practices as "the worst instrument of arbitrary power" and John Adams later claimed that "the child Independence was born" from colonists' opposition to their use. *Id.* at 625. The fundamental purpose of the Fourth Amendment's warrant clause is "to protect against all general searches. *Go-Bart* at 357. The Fourth Amendment "protects all, those suspected or known to be offenders as well as the innocent." *Id.* And this Court long ago recognized that efforts "to bring the guilty to punishment, praiseworthy as they are, are not to be aided by the sacrifice of those great principles established by years of endeavor and suffering which have resulted in their

embodiment in the fundamental law of the land." *Weeks v. United States,* 232 U.S. 383, 393 (1914)." *Messerschmidt v. Millender*, 565 U.S. 535, 560, 571 (2012).

"Qualified immunity does not turn on whether an officer is motivated by good intentions or malice, but rather on the objective reasonableness of an official's conduct." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In *Harlow*, the Court explained that the government agents were not entitled to "*any*" immunity if they violated a citizen's clearly-established constitutional rights, just as the agents did in this case. The idea that the Government is protected by the "good faith" exception of *Leon* is in direct conflict with the Supreme Court's decision in *Groh*, and the Second Circuit's decision in *In re 650 Fifth Ave,* 934 F.3d 147 (2d Cir. 2019). Significantly, in *Groh*, the Court specifically states that an agent is *not* able to rely on good faith for qualified immunity if the search warrant is defective on its face, and that a "good agent of the law" should have known that it was defective and therefore should not have conducted the search and seizure. In other words, according to the Supreme Court, the agents in this case should have known immediately that the Search Warrant was constitutionally defective on its face. Furthermore, this Court ordered the return and/or destruction of Petitioner's property over six years ago. *See* June 4, 2015 Order in *Carpenter v. Shulman*, No. 13-cv-00563. Please see Judge Nathan's scholarly opinion in *United States v. Wey*, 256 F.Supp.3d 355 (S.D.N.Y. 2017), where she found that:

> Under the settled Circuit law set forth above, failure to reference the suspected crimes would alone be enough to render the Warrants insufficiently particularized. *See 650 Fifth Ave*. at 99 ("for a warrant to meet the particularity requirement, it must identify the alleged crime for which evidence is sought"); *George* at 76 (warrant permitting search of evidence "relating to the commission of a crime" lacked particularity because "[n]othing on the face of the warrant tells the searching officer for what crime the search is being undertaken"); *see also United States v. Romain*, 678 Fed.Appx. 23, 24 (2d Cir. 2017) ("[T]he government concedes that the warrant was facially deficient for failing to reference the criminal statutes that [defendant] was accused of violating even though the supporting document did contain that information."). *Wey* at 384.

All six Fourth Amendment violations in *Wey* are readily apparent in this case as well. The Defendants cannot possibly be allowed qualified immunity under the law. It is difficult to imagine a more "clearly established" right than to be "free from unreasonable searches and seizures" by the trespassing federal agents in this case, who held people on the basis of a constitutionally defective warrant that had *no names* and *no crimes* listed on its face. As the Second Circuit and the Supreme Court have stated numerous times:

> "[T]he Fourth Amendment requires particularity in the warrant, not in the supporting documents, and, accordingly, the fact that the warrant application adequately described the things to be seized does not save the warrant from failure to satisfy that requirement, *George* at 75-76 (warrant permitting seizure of evidence "relating to the commission of a crime" was constitutionality infirm because "[n]othing on the face of the warrant tells the searching officer for what crimes the search is being undertaken"). *In re 650 Fifth Ave.* at 99-100, *citing Galpin* at 447 and *Groh* at 557.

Moreover, it is clear from the Supreme Court's decisions that a warrantless search is *per se* unreasonable, and in *Groh,* the Court says the same and cites to *Stanford v. Texas,* 379 U.S. 476 (1975) and *United States v. Marti,* 421 F.2d 1263 (2d Cir. 1970) for the following proposition:

> "The uniformly applied rule is that a search conducted pursuant to a warrant that fails to conform to the particularity requirement of the Fourth Amendment is unconstitutional. *Stanford; Marti* at 1268-69. That rule is in keeping with the well-established principle that except in certain carefully defined classes of cases, **a search of private property without proper consent is unreasonable unless it has been authorized by a valid search warrant.**" *Groh* at 559-60.

As the Supreme Court also explained in *United States v. Grubbs,* 547 U.S. 90 (2006), the Fourth Amendment protects property owners (like Petitioner) by interposing, *ex ante*, the impartial judgment of a judicial officer. The Schrader Warrant of the raid of 2010 and the Allend warrant of the Raid of 2011 were far worse and more constitutionally defective than the glaringly defective warrants in *Groh, 650 Fifth Ave, Galpin,* or *Wey,* and the Second Circuit has made it abundantly clear that "the burden is on the government to demonstrate the objective

reasonableness of the officers' good faith reliance on an invalidated warrant." *See United States.*
*v. Clark*, 638 F.3d 89 (2d Cir. 2011), *citing United States v. George*, 975 F.2d 72, 77 (2d Cir.
1992). "The fact that the *application* adequately described the things to be seized does not save
the warrant from its facial invalidity. The Fourth Amendment by its terms requires particularity
in the warrant, not in the supporting documents." *Galpin* at 448, *citing Groh* at 557 (emphasis in
original). The Lynn Allen Search Warrant not only fails to state a crime, it is not directed at a
federal officer as required by law, and they overstayed their welcome past 3 A.M.

As *Leon* itself makes clear, the "Good Faith Exception" does not apply to a search that
exceeds the scope of the warrant, as clearly happened here. *Leon* at 921-22; *Groh* at 561 n.4. The
trespassing federal officers could be very polite and professional during a search, but if they go
beyond the scope of a valid warrant or operate under a constitutionally defective warrant as in
this case, then they have still violated the Fourth Amendment and no amount of civility or *Leon's*
Good Faith Exception can save them from tortious liability. Not only does the "Good Faith
Exception" not protect the IRS Agents in this case, the Supreme Court has made it clear that
operating outside the confines of a valid search warrant is also unconstitutional. *See, e.g., Horton
v. California*, 496 U.S. 128, 140 (1990) ("If the scope of a search exceeds that permitted by the
terms of a validly issued warrant or the character of the relevant exception from the warrant
requirement, the subsequent seizure is unconstitutional without more."). This is precisely the
same conclusion that the Second Circuit came to in *In 650 Fifth Ave,* 934 F.3d 147 (2d Cir.
2019) and *In re 650 Fifth Ave,* 830 F.3d 66 (2d Cir. 2016):

> The good-faith exception recognizes that "the deterrence benefits of exclusion vary with
> the culpability of the law enforcement conduct at issue." *Davis v. United States*, 564 U.S.
> 229, 238 (2011). "When the police exhibit deliberate, reckless, or grossly negligent
> disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and
> tends to outweigh the resulting costs." *Id.* There are…at least four scenarios where
> reliance on an invalid warrant is unreasonable:

... (4) where the warrant is so facially deficient that reliance upon it is unreasonable. *Clark* at 100 (*quoting United States v. Moore*, 968 F.2d 216, 222 (2d Cir. 1992)).

The fourth scenario "depend[s] on the circumstances of the particular case." *Leon* at 923. It applies, for example, when a warrant "fail[s] to particularize the place to be searched or the things to be seized*." Id.* The animating concern is whether the "warrant [is] so facially deficient...that the executing officers cannot reasonably presume it to be valid." That language fits this case like a glove. This warrant is facially deficient. It does not even arguably include a reference to the Claimants' alleged crimes or a temporal scope for the items to be seized. *650 Fifth Ave.* at 100 ("On its face, the warrant...plainly lacked particularity as to the crimes at issue."). No reasonable officer could have presumed that this glaringly deficient warrant was valid. Under all these circumstances, the Government's reliance on this warrant was not objectively reasonable. *See Leon* at 922. To the contrary, the fact that these glaring deficiencies survived the Government's typical process for drafting, reviewing, and executing warrants indicates grossly negligent disregard for Fourth Amendment rights. *See Davis* at 238. In the presence of gross negligence, the deterrent value of exclusion is strong and tends to outweigh the resulting costs. *Id." In Re 650 Fifth Ave.* at 162-65 (2019).

The government may not rely on the good-faith exception, and this Court should hold the government accountable for its actions and reliance on not one—but two—clearly unconstitutional Search Warrants. Once again, "even where a warrant has been issued, law enforcement agents are bound by its terms: "because a warrant generally authorizes **no more than what it expressly provides**, to act unreasonably beyond the terms of a warrant **is akin to acting without a warrant at all**." *Simon v. City of N.Y.*, 893 F.3d 83, 94 (2d Cir. 2018).

## VII.   THE BRADY-JENCKS VIOLATIONS IN THIS CASE REQUIRE VACATING THE CONVICTION

Pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *United States v. Mahaffy*, 693 F.3d 113, 130 (2d Cir. 2012), *citing Brady* at 87, and *Banks v. Dretke*, 540 U.S. 668, 691 (2004). *Brady* requires that the government disclose material evidence favorable to a criminal defendant. *United States v. Rivas*, 377 F.3d 195, 199 (2d Cir. 2004). Evidence is favorable if it is either exculpatory or impeaching, *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999), and it is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006). "[A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal," but rather, a conviction must be reversed "upon a showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* Where suppressed evidence is inculpatory as well as exculpatory, and its exculpatory character harmonize[s] with the theory of the defense case, a *Brady* violation has occurred.

There is substantial newly discovered *Brady-Giglio-Bagley* evidence that is still being discovered on almost a daily basis due to litigation surrounding the insurance carriers and their losses in major lawsuits brought by their policyholders, which means Petitioner did not receive a fair trial, nor did the prosecution live up to its obligations under the law. *See Turner v. United States,* 137 S.Ct. 1855 (2017), where the Supreme Court held that the government violates the Constitution's Due Process Clause "if it withholds evidence that is favorable to the defense and

material to the **defendant's guilt or punishment**." *Turner* at 1893 *quoting Wearry v. Cain*, 565 U.S. 73, 75 (2012) (emphasis added). *See, also, Crane v. Kentucky*, 476 U.S. 683, 690-91 (1986) ("In the absence of any valid…justification, exclusion of…exculpatory evidence deprives a defendant of the basic right to have the prosecutor's case encounter and survive the crucible of meaningful adversarial testing.").

In this case, all of the newly-discovered evidence is *exculpatory* and none of it is inculpatory, so Petitioner is entitled to a new trial as a matter of law because the binders full of newly-discovered evidence are not just *material* and *exculpatory*, they actually support Petitioner's innocence and the fact that he should not have been indicted or prosecuted in the first place. It is clear that no amount of "due diligence" would have shaken this evidence loose from the government's clinging hands as the government has fought Petitioner every step of the way for the past nine years. Without Judge Underhill's help, the evidence would still be secret. The evidence is certainly not cumulative as it diametrically refutes the Court's 2016 Verdict.

Where, as here, the government suppressed evidence in its possession which was both exculpatory and impeaching, there is a reasonable probability that if the evidence had been disclosed, the outcome of the proceeding would have been different. Even if it is by no means certain that arguments based on wrongfully withheld evidence would have swayed the court, it is a real enough possibility to undermine confidence in the verdict. "[T]he government has the obligation to turn over evidence in its possession that is both favorable to the accused and material to guilt or punishment." *Pennsylvania v. Ritchie*, <u>480 U.S. 39</u>, 57 (1987) (*citing United States v. Agurs*, <u>427 U.S. 97</u> (1976); and *Brady* at 87). A grant of a new trial is warranted if this obligation is not fulfilled. *United States v. Wong*, 78 F.3d 73, 79 (2d Cir. 1996). Evidence is material if there is "a reasonable probability that, had the evidence been disclosed to the defense,

the result of the proceeding would have been different. A reasonable probability is a probability

sufficient to undermine confidence in the outcome." *United States v. Bagley*, <u>473 U.S. 667</u>, 682

(1985). Even assuming *arguendo* that the government's arguments to the contrary make any

logical sense, clearly this is not the law in any circuit in America; certainly not the Second

Circuit where according to *United States v. Payne*, 63 F.3d 1200 (2d Cir. 1995), the government

has a duty to search for *Brady-Giglio-Bagley* information possibly held by or with all branches

and agencies of the government, even including the local police:

> Under *Brady* and its progeny, the government has an affirmative duty to disclose
> favorable evidence known to it, even if no specific disclosure request is made by the
> defense. The individual prosecutor is presumed to have knowledge of all information
> gathered in connection with the government's investigation. [The] prosecutor has a duty
> to learn of any favorable evidence known to the others acting on the government's behalf
> in the case, including the police. Where the government's suppression of evidence
> amounts to a denial of due process, the prosecutor's good faith or lack of bad faith is
> irrelevant. *Payne* at 1208, *citing Kyles* at 437.

There are, of course, a number of other notable Second Circuit cases citing the same

premise and referring to *Strickler* and *Kyles*. It is black-letter law in the Second Circuit under

*Brady* and its progeny that the government has an affirmative duty and obligation to discuss with

all of the investigators on a case the potential for any and all *Brady-Giglio-Bagley* evidence. *See,*

*e.g., United States v. Martoma*, 869 F.3d 58 (2d Cir. 2017) discussing the need to search the files

of the SEC for *Brady-Giglio-Bagley* evidence, or *United States v. Gil*, 297 F.3d 93 (2d Cir. 2002)

stating that the government had a duty to turn over a memo from the New York City Off-Track

Betting Corporation ("OTB") prior to the start of the trial involving mail fraud and inflated

invoices. The government's duty under *Brady* is fairly settled in that it must be disclosed in time

for its effective use at trial:

> To the extent that [a] prosecutor knows of material evidence favorable to the defendant in
> a criminal prosecution, the government has a due process obligation to disclose that
> evidence to the defendant. Information coming within the scope of this

principle...includes not only evidence that is exculpatory, *i.e.*, going to the heart of the defendant's guilt or innocence, but also evidence that is useful for impeachment, *i.e.*, having the potential to alter the assessment of the credibility of a significant prosecution witness. *Gil* at 101, *citing Leka v. Portuondo*, 257 F.3d 89, 98 (2d Cir. 2001), *quoting United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998).

The critical *Brady* evidence in *Gil* was a memo that was provided in a Box marked "3500 material" along with 2700 other pages a day before the trial began. The Second Circuit also went on to say that:

> The Government is reasonably expected to have possession of evidence in the hands of investigators, who are part of the "prosecution team." *Kyles* at 438. The government thus constructively possessed the [OTB] memo long before it was turned over to the defense. *Gil* at 105-07.

The government cannot pretend that they did not know about the commando raid of April 20, 2010 because as it admits, AUSA Michael Gustafson assisted AUSA Gordon Giampietro with the facially defective Search Warrant. Moreover, AUSA Novick subpoenaed 39 boxes of documents as part of the May 26, 2011 unlawful seizure, and much of the evidence used at Petitioner's trial was clearly "fruits of the poisonous tree" from the Raid of April 20, 2010. But even if there was only one piece of paper unlawfully seized, Petitioner is entitled to relief. *See United States v. Wey*, 256 F.Supp.3d 355 (S.D.N.Y. 2017). Additionally, the government was fighting Petitioner in the *Bivens* Action in Judge Underhill's court and even told Judge Hall in a different matter to unseal the Search Warrant Affidavit that Petitioner was "anti-government" because of a book he had written describing the unconstitutional attacks on 100 Grist Mill Road. More than ten years after the Raid, the government makes the argument that they are not responsible for any statements or information taken by the IRS, only by the DOL. However, the excerpt of Shaun Schrader's Search Warrant Plan of Operation that was filed under seal as part of Doc. 97 was never given to Petitioner, nor was it properly disclosed to Petitioner's defense team as "*Brady*" evidence. Just the fact that it was filed under seal in November of 2014 and

never referenced as "*Brady* Material" should preclude the government from even mentioning it as "*Brady* Material" much less stating that it is the equivalent to the truly material *Brady-Giglio-Bagley* evidence contained in the Synopsis of the Case.

Compare this to the same pages that Petitioner submitted in Doc. 243 from Shaun Schrader's civil deposition concerning the Search Warrant Plan of Operation. It is clearly prohibited by the Constitution to unlawfully seize 322 boxes and 12 computer servers and then to make copies of that unlawfully-seized information and then do a data dump back to Petitioner's defense team and state that they have satisfied their obligations under *Brady-Giglio-Bagley*. "The government cannot hide *Brady* material as an exculpatory needle in a haystack of discovery materials." *United States v. Thomas*, 981 F.Supp.2d 229, 239 (S.D.N.Y. 2013), *citing United States v. Skilling,* 561 U.S. 358 (2010).

## A. THE CHERNESKI DECLARATION REQUIRES VACATING THE PETITIONER'S CONVICTION

Unlike with a *Brady* or *Bagley* violation, the Jencks Act does not require the defendant to show prejudice. *See e.g. United States v. Allen Well*, 572 F.2d 1383 (9th Cir. 1978), where the Ninth Circuit affirmed the mistrial granted to a defendant accused of mail fraud due to a Jencks Act violation:

> The Jencks Act does not require the defendant to show prejudice. The Act provides that after a government witness testifies at trial the government must produce, on request, any previously made statements by that witness which relates to the witness's testimony on direct examination. 18 U.S.C. §3500(d). As the Supreme Court noted in its comprehensive discussion of the Jencks Act in *Palermo v. United States*, 360 U.S. 343, 353 n.10 (1959), "the statute does not provide that inconsistency between the statement and the witness' testimony is to be a relevant consideration" in determining which statements must be produced. *Well* at 1384.

There can be no doubt that the Cherneski statement given to two federal agents constitutes both a withheld statement by a government witness under the Jencks Act, and also

newly-discovered evidence pursuant to Rule 33(b)(1) because it was not discovered until recently when it was turned over in the deposition of Agent Kathy Enstrom, who was the Special Agent in charge of the April 20, 2010 raid on 100 Grist Mill Road that is currently *sub judice* in front of Judge Underhill. For the purposes of the Jencks Act, there can be no doubt that the Cherneski Statement is a "statement" under *Jencks*, and that it should have been turned over to the defense no later than the day that Mr. Cherneski testified. While Petitioner need not establish "prejudice" for the purposes of the Jencks Act, Cherneski's truthful statements given to the federal agents on April 20, 2010 (because he realized and was told that lying to a federal agent is a crime, see Cherneski Statement paragraph 17) cannot possibly be described as "harmless" as it not only refutes, but also wholly contradicts many of the Court's conclusions in its Verdict of June 6, 2016.

As will be described below, the Cherneski Statement is also clearly *Brady-Bagley*-worthy evidence that would have allowed Petitioner's counsel to impeach Cherneski's inconsistent testimony or at least give the Court a clearer picture of Petitioner's limited role at 100 Grist Mill Road in the years prior to 2010. Not only does the Cherneski *Jencks* Statement exonerate Petitioner, it qualifies both as newly-discovered evidence for Rule 33(b)(1) and as *Brady* and *Bagley* evidence that surely would have had the "reasonable" possibility of a different result for Petitioner under both *Kyles v. Whitley*, 514 U.S. 419 (1995), and *Strickler v. Greene*, 527 U.S. 263 (1999). First, please see Mr. Cherneski's declaration that was attached to several Rule 41(g) motions brought by various parties in civil litigation in front of Judge Covello. In this declaration, Petitioner's name is not mentioned at all, but the interrogation by federal agents is. Neither of Mr. Cherneski's statements mention the Charter Oak Trust or Grist Mill Capital, and

his Jencks Act statement only mentions Petitioner in paragraph 29. And, in passing, Mr. Cherneski says this about Petitioner:

> "Dan Carpenter is a consultant and outside counsel for all of the businesses. Carpenter also operates a business named ARIA."

Second, as the Court should be well aware by now, the unlawful raid of April 20, 2010 was entitled the "Guy Neumann" investigation and had nothing to do with Petitioner, Grist Mill Capital, or the Charter Oak Trust. That simple fact, however, did not stop AUSA Novick from sending a subpoena to Halloran & Sage ordering them to turn over 29 boxes unlawfully seized in the raid of April 20, 2010 pursuant to Agent Allen's investigation and raid of May 26, 2011. Despite the fact that all of the evidence used against Petitioner at his trial was the "fruit of the poisonous tree" (see *Wong Sun v. United States,* 83 S.Ct. 407 (1963)) in violation of both the Fourth Amendment (*See e.g. United States v. Benjamin Wey, et al.,* 15-CR-0611 (AJN)) and the Fifth Amendment, when such evidence is used at trial, (see famous Justice Brandeis dissent in *Olmstead v. United States*, 277 U.S. 438 (1928)), that is not the point Petitioner wants to make in this motion. Petitioner also wants to make clear that AUSA Novick's subpoena in May of 2011 did not erase or purge the taint of the "poisonous fruit" of the unlawful search of April 20, 2010 that mentions Petitioner's name nowhere in either search warrant; but that, too, is for a different motion to dismiss the indictment in this case. In this Motion, Petitioner wants to respectfully point out to the Court just how categorically wrong a number of statements made by the Court in its June 6, 2016 Verdict are, and the Court would not have made those egregiously wrong statements had the Court had the benefit of Mr. Cherneski's Statement from April 2010 to contrast with his testimony of February 2016.

Third, it should also be obvious to the Court by now that the government did not call **any** Benistar witnesses that were present for **both of the raids** of April 20, 2010 and May 26, 2011

though there were a number of Benistar people on the witness list that the government suggested would be called, but decided not to for whatever reason. Petitioner has already claimed that the government did in fact intimidate all of the witnesses that would have been favorable to his defense. To the contrary, the witnesses the government did call like witness Jenny Valedaserra left Benistar in 2009, Charlie Induddi-Westcott who lived in Millerton New York left the Benistar "entities" right after the raid of April 20, 2010 and was later terminated by Lincoln because of the IRS raid and not for lying on an application about STOLI. Mr. Cherneski also left Benistar under suspicious circumstances shortly after Guy Neumann did in the summer of 2010. The government's main witness against Petitioner, Ed Waesche, never worked at 100 Grist Mill Road, and the only thing we can be sure of is that he lied to, cheated, and stole from Petitioner's company Grist Mill Capital. But, these are the witnesses that the Court relies upon to come to the following wholly erroneous conclusions in its June 6, 2016 Verdict that has totally destroyed Petitioner's good name and reputation in the insurance industry over the internet for conduct that was not only innocent, but has never been considered criminal in any previous prosecution, i.e., the providing of funding for the purchase of life insurance policies in a trust. Examples where the Court's Verdict erroneously relies on Cherneski's testimony that is contradicted by his *Jencks* Statement include the following:

> Overwhelming evidence refutes the defendant's account. Several witnesses credibly testified that COT was formed to serve as a vehicle for acquiring life insurance policies for resale to investors. Stefan Cherneski, an employee of the Benistar Entities, testified that COT was structured to appear like an ordinary welfare benefit plan but that its true purpose was to procure policies on elderly insureds for resale in the life settlement market. His testimony is corroborated by the testimony of Ed Waesche and Charles Westcott, a licensed life insurance agent with Lincoln who recruited insureds to participate in COT. In addition, the evidence establishes that individuals recruited to participate in COT as straw insureds believed their policies would be sold to third parties after two years. Verdict at 28.

The defendant played a key role in instructing others how STOLI-related questions should be handled. Stefan Cherneski credibly testified that the defendant provided instructions during group meetings in Simsbury. Mr. Cherneski also witnessed a conversation between the defendant and Charles Westcott during which the defendant instructed Mr. Westcott to complete the Lincoln applications in a certain way. Mr. Cherneski recalled that in both instances, the defendant provided the same justifications for the answers -- i.e., the spurious explanation that COT was participating in a "modified split-dollar arrangement." Verdict at 50.

It appears that the Declaration of Trust was altered by the defendant in the wake of Mr. Spencer's death for the specific purpose of enabling COT to keep twenty percent of the total death benefit of $30 million. This conclusion is supported by the testimony of Stefan Cherneski, who stated that he knows the trust documents were changed at that time because he reviewed them. Verdict at 73.

The Government would have the Court believe (as apparently it did) that 100 Grist Mill Road was one big fraudulent enterprise under the control of Petitioner as a criminal mastermind. The April 20, 2010 Cherneski *Jencks* Statement decimates the Court's Verdict and Petitioner's limited role – if any – at 100 Grist Mill Road. And as the Court suggests on Page 28, Mr. Cherneski's testimony was corroborated by Waesche and Westcott who did not have offices at 100 Grist Mill Road. Also note on Page 50 of the Verdict that the Court refers to: "i.e. the spurious explanations that COT was participating in a modified split-dollar arrangement." Paragraph 10 of the Cherneski *Jencks* Statement where he describes the same Split-Dollar "collateral assignment arrangement" used by the other welfare benefit plans that were administered out of 100 Grist Mill Road is in direct conflict with this. This is clearly exculpatory and would have been crucial material evidence, had it been provided in a timely manner.

In Paragraph 3 of his *Jencks* statement, Cherneski admits that he had no prior training in welfare benefit plans, tax law, or insurance, and that Cherneski reports to Guy Neumann (the subject of the April 20, 2010 raid) and Wayne Bursey – not Petitioner. In Paragraph 4, Mr. Cherneski suggests that there are many individuals working for many companies and does not mention Petitioner. In Paragraph 5, Cherneski states that Molly Carpenter is the chairperson of

48

Benistar – and he stated "that he does not deal with Benistar plans and is not familiar with its' (sic) plans." This statement alone should cause the Court concern in its over-reliance on Mr. Cherneski's testimony at trial. Paragraphs 15, 16, and 18 are even more significant because Mr. Cherneski actually argues with the two federal agents and insists that the only way that someone can get their policy out of a plan is with a 100% buyout of the policy by the insured – "since Cherneski began his employment."

Cherneski again mentions in Paragraph 18 that there is no possible "tax abuse" in the NOVA 419 plans because "the covered employee is required to pay 100% of the fair market value of the policy." He mentions that none of the carriers have any problems with the "collateral assignments and any Forms 1099 to be issued by them." Once again "collateral assignment" is the heart of the Split-Dollar Arrangement for funding the purchase of policies in a welfare benefit plan. Nowhere do the federal agents (or Mr. Cherneski) use the words "premium financing" or "STOLI" or "Grist Mill Capital" or even "Charter Oak Trust" for that matter – and this raid was in April of 2010 four months after the last Charter Oak Trust policy had been issued. Similarly in Paragraph 24, Mr. Cherneski describes the difference between the Grist Mill Trust, which was mentioned favorably by the representatives of the carriers at Petitioner's trial, and the NOVA Benefit Plans which were the subject of the April 20, 2010 raid. There is no tax deduction for contributions to the Charter Oak Trust, but it is clear that the carriers were worried about "listed transactions" status and not "STOLI" transactions.

Mr. Cherneski mentions Rex Insurance Services in Paragraph 26 of his *Jencks* statement, which is run by the target of the investigation, Guy Neumann. As the Court is aware from other filings, on page 8 of Agent Shaun Schrader's Search Warrant Plan of Operation – Rex is listed as one of the "legitimate" businesses operating out of 100 Grist Mill Road. This is significant for

several reasons. Who told Agent Schrader that Guy Neumann's company Rex Insurance Services was a legitimate business, when BASI does over $100 million in revenue and paid $60,000 a month in rent, but had their offices raided because of a fraudster in Milwaukee ripping off Social Security? All of this was discovered in the July 2017 deposition of Agent Schrader, yet none of this was disclosed to Magistrate Smith when he approved the constitutionally-defective Schrader Search Warrant. On June 9, 2016, more than six years after the raid, the government dropped its investigation in the Eastern District of Wisconsin without indicting anyone and without bringing criminal claims against anyone based on the Shaun Schrader Search Warrant Affidavit's accusations. Petitioner would certainly appreciate the government explaining who told Agent Schrader that Rex was a legitimate business, because it was the only company at 100 Grist Mill Road involved in the Life Settlement business for various investment firms.

But perhaps the most egregious fraud on the Court is the government's canard of Petitioner amending the Declaration of Trust in the wake of Sash Spencer's death "for specific purposes of enabling COT to keep twenty percent of the total death benefit of $30 million. This conclusion is supported by the testimony of Stefan Cherneski, who stated that he knows the trust documents were changed at that time because he reviewed them." See Verdict at 73. Not only do the contradictory statements by Cherneski in his *Jencks* Statement put all of his testimony into question, the utter absurdity of this statement requires a new trial in and of itself because Petitioner was accused in the indictment of lying to carriers to induce them to issue policies that Petitioner would then somehow take over and control unbeknownst to Christiana Bank and Ridgewood and somehow sell those policies on the open market potentially at a great loss – because Petitioner would know that those policies could be voided at any time by the carriers and

so they would be worthless on the market – and even more so because of the historical economic crisis that started in October of 2007. But if that was the crime Petitioner was charged with in the Indictment, why should he "alter" the Trust to gain 20% for the Trust when he is accused of wanting all of those policies for himself to sell on the market like the investors in *Binday*. If Petitioner really had full control of all the policies in the Charter Oak Trust, he would have **kept 100%** of the Sash Spencer death benefits for his company Grist Mill Capital, which in fact did provide all of the funding for all of the policies with the knowledge of the carriers, so there would be no reason for Petitioner to amend the Charter Oak Trust documents to deprive his company of 20% when according to the Court's Verdict, Petitioner was entitled to 100% of all the policies. Also, there would have been no reason to pretend to authorize the payment of $19 million to Universitas, or swear at Jack Robinson or Don Trudeau because they wanted to expedite the payment of the claim.

There is no question that the Charter Oak Trust was amended and according to the recent emails provided by the government "Lincoln had five copies of the official document" and no copies of the document that Bruce Mactas, Universitas, and ostensibly even the government claims to be the original. Once again, Petitioner dealt with the reasons for the amendment of the document on the stand, but the Court chose to believe Mr. Cherneski who had no background in law, insurance, or welfare benefit plans and he doesn't even mention Petitioner's limited role at 100 Grist Mill Road until Paragraph 29 of his *Jencks* Statement.

Each of these erroneous conclusions in the Verdict would have been refuted and corrected in an effective cross-examination by Attorney Guarnieri, who had to do the cross-examination because Attorney Brown was once Mr. Cherneski's attorney before he met Petitioner after the raid of May 26, 2011. Once again, neither Jenny Valedaserra, nor her

husband Stefan Cherneski, was there for the raid of May 26, 2011, nor were they there for the foreclosure on the Charter Oak Trust by Ridgewood in September of 2010. Charles Induddi-Westcott was not there in May of 2011 either because he terminated his relationship with Benistar immediately following the raid of April 20, 2010, but he lived in New York and dealt with Lincoln agents all over the country from his home in New York – not 100 Grist Mill Road. Most irrational of all is that the Court should listen to Ed Waesche as to what went on at 100 Grist Mill Road because, other than perhaps one or two visits there, Mr. Waesche worked out of Benistar's Stamford office, and never visited Simsbury. None of these witnesses were competent or credible to support the statements made by the Court in its June 6, 2016 Verdict, and for that reason alone the Court should grant Petitioner's Motion for a New Trial in the interests of justice pursuant to Rule 33(b), because the government failed to turn over the exculpatory statement of a government witness that was clearly in the government's possession for the past nine years.

### B. THE CHERNESKI STATEMENT WAS CLEARLY *JENCKS-BRADY-GIGLIO-BAGLEY-NAPUE* EVIDENCE THAT SHOULD HAVE BEEN PROVIDED TO THE DEFENSE

The government's conduct in this case is even worse than the infamous conduct in the Senator Ted Stevens case. Not only did the government possess the "Cherneski *Jencks* Statement", it also clearly possessed the Synopsis of the Case for the April 20, 2010 Raid's Search Warrant, which was sent to the IRS higher-ups in Washington to get permission for the unlawful commando raid in the first place. Moreover, the very documents the government submitted to exonerate their constitutionally prohibited conduct clearly states that they will be *interviewing* Guy Neumann, Kevin Slattery, and Richard Belding, as well as the *testifying witness, Stefan Cherneski*. Therefore, how can the government possibly claim in 2017 that they

had no knowledge of the Cherneski *Jencks* Statement "interview" of April 2010 when they themselves submitted the Agent Schrader Search Warrant Plan under seal with Doc. 97 in November 2014, and that document clearly shows the intent of the government to interview and get a statement from Stefan Cherneski? This is the point the government fails to understand, and the point it does not even consider, that even assuming that the Cherneski *Jencks* Statement was not "*Jencks*" (which it was), it was most certainly *Brady-Giglio-Bagley* information that was necessary to disclose prior to trial so that it could be effectively used in Petitioner's defense. The government has a heavy burden in overcoming the *Jencks* and *Brady-Bagley* violations here.

The Jencks Act was intended "to provide defendants in federal prosecutions with an opportunity for thorough cross-examination of government witnesses, making the constitutionally guaranteed right of confrontation more meaningful." *United States v. Aaron*, 457 F.2d 865, 869 (2d Cir. 1972). "Since the production of at least some of the statements withheld was a right of the defense, it is not for us to speculate whether they could have been utilized effectively." *Aaron* at 869, *citing Clancy v. United States*, 365 U.S. 312, 316 (1957).

The significance of the Cherneski *Jencks* Statement (Exhibit One) when added to the Synopsis of the Case and the other statements made by Federal Agents working on a multi-million dollar undercover investigation, is that no one thought that Petitioner was criminally involved in anything happening at 100 Grist Mill Road, much less "running" things as the Court erroneously concludes in its June 6, 2016 Verdict based on the supposedly "overwhelming" evidence in this case. That is also why Petitioner has been deeply prejudiced by the government's "inadvertent" withholding of the Cherneski *Jencks* Statement and the Synopsis of the Case. The Charter Oak Trust and Petitioner's company Grist Mill Capital are nowhere mentioned in this extensive investigation by the government in 2010, and yet the limited

existence of the Charter Oak Trust was from January 2007 to December 2009; well before the approval of the raid of Petitioner's building and office in April of 2010 by Magistrate Smith based on totally erroneous and fictitious information provided by Agent Schrader. The government claims that Petitioner should have been put on notice of the explosive content of the "Synopsis of the Case" because it filed, under seal, several pages from Agent Schrader's Search Warrant Plan that makes the same claim that Mr. Bursey and **not** Petitioner, "controls" all of these companies:

> "Nova Benefit Plans is a company located in Simsbury, CT. Per its brochure, the company offers comprehensive welfare benefit plans – with plans offering single or multiple benefits, ranging from sickness & accident to long term care and life coverage. Nova Benefit Plans was incorporated in 2004 in the state of Delaware. Numerous companies related to NOVA have also been identified, including Benistar, Benefit Plan Advisors, and US Benefits Group. It is believed that all of the companies are run by the same individuals and that **the head of these companies is Wayne Bursey**." See Exhibit Two, Bottom of Page 1 (emphasis added).

As the Court can clearly see, neither the Search Warrant nor Agent Enstrom's Synopsis of the Case, nor Agent Schrader's Background Investigation in the Search Warrant Plan pages 1, 7, and 8 attached as Exhibit Three mention Petitioner, much less paint him as the figure "in control" of the Benistar Entities as portrayed by the Court's June 6, 2016 Verdict. In fact, the Court should note that there was a business operating at the same time as the Charter Oak Trust known as Rex Insurance Services (REXIS), which Agent Schrader mentions on his Search Warrant Plan as being one of the several legitimate businesses being run out of the building:

> "The investigation has shown that some businesses being run out of the building *may be legitimately* providing insurance and other financial services including: Rex Insurance Services." (Emphasis added and in original). See Exhibit Three, page 8.

The significance of Agent Schrader's statement is threefold. First, REXIS was run by Guy Neumann – the named target of the 2010 Raid – and his good friend Stefan Cherneski, which the government shows sent many emails as Stef@REXIS. There are no Dan Carpenter

emails with Dan@REXIS. To the contrary, Petitioner's "REX is us" email was to provide an introduction for Guy Neumann to meet Petitioner's friend Chad Gerdes, because Petitioner was known in the insurance industry while Mr. Neumann was not.

Second, whereas the Charter Oak Trust had an indisputable insurable interest in all of the Insureds, and Grist Mill Capital had a Split-Dollar Collateral Assignment interest in all 87 policies, REXIS had created over 500 policies for banks and investors that had no insurable interest and were all based on the same individual "Irrevocable Life Insurance Trusts" as were used in *United States v. Binday*, 804 F.3d 558 (2d Cir. 2015). While Petitioner maintains that he did not lie to anyone on any of the Charter Oak Trust applications, Guy Neumann and Stef Cherneski lied on each and every one of the more than 500 REXIS' applications that Agent Schrader says were all legitimate. Now that the Court has concluded in 2017 that STOLI was a crime in 2006-2009 and that Mr. Waesche and Mr. Bursey committed criminal acts by lying on insurance applications, Petitioner is entitled to go over each of the 500 Rex applications that Mr. Cherneski was involved in to see how many lies he told through the allegedly "legitimate" business, REXIS. Not only did the Court overrule Petitioner's multiple objections to the obvious Cherneski hearsay during trial, the Court has assumed that Mr. Cherneski was a "co-conspirator" of Petitioner in order to let that hearsay infect his trial, and that Petitioner somehow told everyone what to do at 100 Grist Mill Road. Neither of these statements is true, and all of these lies are refuted and contradicted by the Cherneski *Jencks* Statement.

Finally, it should be readily apparent to the Court by now that the reason Mr. Cherneski kept changing his story from April 2010 until February 2016 was that it was not until Petitioner and Mr. Bursey were indicted in December of 2013 that Mr. Cherneski realized that in the eyes of the government, he had committed a crime just like the Court stated that Mr. Waesche and Mr.

Bursey did. See the last page of the Court Transcript from the November 6, 2017 telephone conference (Doc. 312). See, also, more details of the various inconsistencies and the significant differences between what Mr. Cherneski said in 2010 versus 2016 in Petitioner's original brief, Doc. 296. Significantly, if for no other reason, Petitioner is entitled to a *Jencks* Act new trial pursuant to Rule 33(b) because Mr. Cherneski told Federal Agents on April 20, 2010:

29.  Dan Carpenter is a consultant and outside counsel for all of the businesses. Carpenter also operates a business named ARIA.
30.  Molly Carpenter is the Chairman of Benistar Admin Services, Inc. (BASI). Molly runs the day to day operations of the various businesses.

See Cherneski *Jencks* Statement, Exhibit One, at paragraphs 29 and 30. But then on August 27, 2015, Mr. Cherneski told DOL Agents that Petitioner and not his wife was at the top of the Benistar hierarchy ("Daniel Carpenter was the top of the hierarchy at Benistar"), which was then followed by an even bigger lie at trial:

Q.  Were you aware of any particular person that controlled the companies that called 100 Grist Mill Road company home?
A.  Dan Carpenter was located there. T. Tr., Vol. I., p. 66.

Obviously, these massive contradictions in testimony by Mr. Cherneski beg the question as to why Mr. Cherneski changed his story, as the differences here are as stark as "night and day." Could it be that by August of 2015, Mr. Cherneski's attorneys and the government told him about the *Binday* convictions? Mr. Cherneski certainly knew that Petitioner was already in prison in 2015 for unrelated crimes; and he certainly knew about Mr. Bursey and Petitioner's indictments. Perhaps it was also the fact that Mr. Cherneski knew two things for sure: First, Petitioner did not lie on any insurance application submitted by the brokers involved with the Charter Oak Trust and yet was indicted; and second, Cherneski and his wife Jenny Valedaserra were exposed on the applications which they worked on through REXIS, which was the *only* company at 100 Grist Mill Road involved in the Life Settlement business, or, arguably, in the

business of misleading insurance carriers to induce them to issue policies to fake Irrevocable Life Insurance Trusts controlled by Investors just like in *Binday*. Both of them were heavily involved with every single REXIS STOLI policy. Obviously if Petitioner wanted to do STOLI policies, he could have easily done it through REXIS, that is, of course, if it is in fact true that he controlled everything at 100 Grist Mill Road. Unless the Court grants a new trial, we will never know why Mr. Cherneski changed his story and perjured himself at Petitioner's trial. Moreover, it cannot be disputed that Mr. Cherneski's contradictory testimony, and in some cases outright perjury, tainted Petitioner's "fair" trial.

In demonstrating harmless error when a constitutional violation occurs, "it is not enough to negate an effect on the outcome of the case." The government must prove that the error was **harmless beyond a reasonable doubt**. *United States v. Johnson*, 850 F.3d 515, 522 (2d Cir. 2017), *quoting United States v. Tien*, 720 F.3d 464, 469 (2d Cir. 2013), and *United States v Dominguez Benitez*, 542 U.S. 74, 81 n.7 (2004) (emphasis added). There are three components of a true *Brady* violation: the evidence at issue must be favorable to the accused either because it is exculpatory, or because it is impeaching (both are applicable here); the evidence must have been suppressed by the State, either **willfully** or **inadvertently**; and prejudice must have ensued. *United States v. Rivas*, 37 F.3d 195, 199 (2d Cir. 2004) *quoting Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). To establish prejudice, a plaintiff need only show **materiality**:

> A showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant). The touchstone of materiality is a reasonable probability of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but *whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. Poventud v. New York,* 750 F.3d 121, 133 (2d Cir. 2014), *quoting Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (emphasis in *Poventud*).

While *Brady-Giglio-Bagley* and their Second Circuit progeny are meant to ensure a fair trial, a defendant's right to pre-trial disclosure under *Brady* is not limited or conditioned on his ability to demonstrate that he **would** or even **probably would** have prevailed at trial if the evidence were disclosed, much less that he is in fact innocent. "The remedy for a *Brady* claim is therefore a new trial, as proof of the constitutional violation need not be at odds with his guilt." *Poventud* at 133. This, the government fails to understand. Even assuming *arguendo* that the Cherneski *Jencks* Statement was not *Jencks* evidence *per se*, it clearly was **material** *Brady-Bagley* evidence and it was inadvertently suppressed by the government and never turned over to Petitioner. Therefore, the government must prove this constitutional error was **"harmless" beyond a reasonable doubt**. Because those words are mentioned nowhere in the government's brief, much less argued or proven beyond a reasonable doubt, Petitioner is entitled to a new trial as a matter of law.

Since the Cherneski *Jencks* Statement was also clearly *Brady-Giglio-Bagley* evidence, as well as "*Jencks*" evidence, the government had an affirmative duty to present that statement to Petitioner before his trial began. While the Synopsis of the Case and the Cherneski *Jencks* Statement are exculpatory because they both support Petitioner's innocence, they were both created after the Charter Oak Trust had run its course, and both directly contradict the alleged "facts" in the Court's June 6, 2016 Verdict, there can be no doubt that the Cherneski *Jencks* Statement is also **"impeaching"** under *Bagley* because of all of Mr. Cherneski's contradictory statements; and now it is clearly *Giglio* evidence as well because the substantial contradictions between what Mr. Cherneski said in April 2010 versus what he said at Petitioner's trial in February 2016, and what is actually the truth of the matter are three totally different things. Petitioner respectfully submits to the Court that Mr. Cherneski submitted false testimony at

Petitioner's trial to protect his wife – and possibly himself – from indictment due to their substantial involvement with REXIS, and the government obviously knew that Mr. Cherneski's testimony was false because government officials possessed the Cherneski *Jencks* Statement, the Cherneski 302 Reports, the Synopsis of the Case, and the Schrader Search Warrant Plan of Operation, all of which clearly point out that Mr. Cherneski gave an interview in 2010 that contradicted his later interviews in 2013 and 2015, and then lied at Petitioner's trial and the government knew it. They allowed the false testimony to stand to secure an unjust verdict without bringing it to the Court's attention as they are required to do under *Giglio* and *Napue v. Illinois*, 360 U.S. 264 (1959). Therefore, Petitioner is entitled to a new trial as a matter of law pursuant to *Brady-Giglio-Bagley* and *Napue*, as well as *Jencks*.

All parties now also know that despite the Government's assertions that Petitioner should "wait and see," the Government did not wait and had this *Brady* information for several years, several months, and has produced fictitious numbers to inflate Petitioner's Restitution as well as his Offense Level. A year after the government's opposition in November 2014, in December 2015, in denying Petitioner's Rule 17(c) motion, this Court agreed with the Government despite the fact that the Sentencing Guidelines had been amended to include SGA 792 a month earlier in November 2015. The Court stated:

> "With regard to request 7, which seeks documents relating to the profit or loss of the insurance providers in connection with the policies, the Government correctly points out that such documents are not relevant to whether the defendant committed the charged offenses and thus are unlikely to be admissible at trial. *See Ferguson* at \*3 (quashing 17(c) subpoena because defendant "provided no basis upon which [the documents] could be admitted at trial"). Doc. 156 at 11.

Unfortunately, this fact did not stop the Government, as it presented the alleged specious and speculative loss numbers during his Sentencing, and Petitioner was denied the chance to rebut or show the Court how fictitious and exaggerated these numbers were because not only

was he denied the ability by various court rulings to get the numbers for himself, the Government has never provided this clear *Brady* evidence to this day. In *Kyles v. Whitley*, 514 U.S. 419 (1995), the Government's obligation under *Brady* is continuous and all-encompassing throughout the entire trial process, including after the Verdict and Sentencing. The Supreme Court held that the government violates the Constitution's Due Process Clause. In *Wearry v. Cain*, 565 U.S. 73 (2012), a convicted murderer was released based on false testimony sanctioned by the Government:

> "[T]he suppression by the prosecution of evidence favorable to an accused violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady* at 87. *See also Giglio* (clarifying that the rule stated in *Brady* applies to evidence **undermining witness credibility**). "Evidence qualifies as material when there is "**any reasonable likelihood**" it could have affected the verdict. *Giglio v. United States*, 405 U.S. 150 (1972) (*quoting Napue v. Illinois*, 360 U.S. 264, 271 (1959)). To prevail on his *Brady* claim, Wearry need not show that he "more likely than not" would have been acquitted had the new evidence been admitted. *Smith v. Cain*, 132 S.Ct. 627, 629-31 (2012). He must show only that the new evidence is sufficient to "**undermine confidence**" in the verdict. *Id.*" *Wearry* at 75 (emphasis added).

In the following pages, Petitioner will point out a dozen serious and fundamental constitutional violations that under any other circumstances should have resulted in a new trial, a judgment of acquittal, or a dismissal of the indictment based on the egregious prosecutorial misconduct in this case. The government realized it had a constitutionally defective indictment in this case, so it had to constructively amend the indictment in order to avoid the true facts of this case and keep to the *Binday* story line it adopted in late 2015. It did this to make this case more like the *Binday* "Right to Control" Theory of Fraud, thereby changing the case from one of affirmative misrepresentations (lies) alleged in the indictment, to what Petitioner failed to tell them about Grist Mill Capital being the funder of the policies in the Charter Oak Trust. Of course the government knew the truth because they raided 100 Grist Mill Road not once, but twice, after

the Charter Oak Trust had closed and the policies were turned over to Ridgewood through Christiana Bank. Christiana Bank was later sued by Universitas at the same time Petitioner's trial was going on, yet the government did not alert Petitioner's counsel as required under *Brady-Giglio-Bagley*.

Even worse is the fact that in the Summer of 2017, thanks to Judge Underhill's ruling, Petitioner was able to obtain the statement made by Stef Cherneski to the raiding officers that directly contradicts the testimonies he and his wife Jenny Valedaserra made on the stand, and which totally exonerates Petitioner. Significantly, no questions were even asked about the Charter Oak Trust, and Petitioner was not mentioned until Question 29, and Chernesky's answer was that Petitioner is an outside consultant and not the person who runs everything at 100 Grist Mill Road. In fact, according to the Shaun Schrader search warrant Plan for the Raid April 20, 2010, it was Wayne Bursey that ran everything at 100 Grist Mill Road. Unfortunately, Mr. Bursey died before Petitioner's trial and Mr. Robinson died a year before Petitioner's sentencing, so there was an incredible amount of Due Process delay in this case and Petitioner has suffered tremendous prejudice because of that Due Process delay. And the fact that he did not receive the Chernesky Statement until 18 months after his trial.

## VIII. THE CUMULATIVE EFFECT OF THE PROSECUTORIAL MISCONDUCT AND IMPROPER GOVERNMENTAL ACTIONS AGAINST PETITIONER CONSTITUTE FUNDAMENTAL UNFAIRNESS THAT DEPRIVED PETITIONER OF DUE PROCESS AND A FAIR TRIAL

While each of the constitutional and procedural issues set forth in this motion are each independently sufficient to warrant setting aside Petitioner's verdict, cumulatively the issues presented require it. In combination, these infirmities served to prevent Petitioner from preparing and presenting any meaningful defense to the charges, much less his best defense, which is guaranteed by the Constitution, and essentially permitted the government to assassinate his character and distort the truth in a trial by ambush. Moreover, the government did not give the Petitioner warning of the select emails they intended to present at trial until the eleventh hour.

The "cumulative unfairness" doctrine is firmly embedded in the Second Circuit. *United States v. Al-Moayad*, 545 F.3d 139, 178 (2d Cir. 2008), *citing United States v. Guglielmini*, 384 F.2d 602, 607 (2d Cir. 1967) (determining that, singly, the errors at trial might not require reversal, but that "occurring at the same trial, the total effect of the errors...found...cast such a serious doubt on the fairness of the trial that the convictions must be reversed"). Accordingly, the substantial accumulation of errors, as set forth in this Petition, requires the granting of the relief to dismiss the Indictment. Similarly, the concept of cumulative error is also well established. As the Second Circuit noted in *Al-Moayad*, "[t]he Supreme Court has repeatedly recognized that the cumulative effect of a trial court's errors, even if they are harmless when considered singly, may amount to a violation of due process requiring reversal of a conviction." *Al-Moayad*, 545 F.3d at 178, *citing Taylor v. Kentucky*, 436 U.S. 478, 487 n.15 (1978), and *Chambers v. Mississippi*, 410 U.S. 284, 302-03 (1973).

IX. **THE EGREGIOUS PROSECUTORIAL MISCONDUCT IN THIS CASE REQUIRES VACATING PETITIONER'S CONVICTION AND DISMISSING OF THE SUPERSEDING INDICTMENT IN ACCORDANCE WITH US V. NEJAD**

In *United States v. Nejad*, 521 F. Supp. 3d 438, 442 (S.D.N.Y. 2021), Judge Alison Nathan not only vacated the defendant's conviction and dismissed the indictment in that case with prejudice, she reported the prosecutors to the Office of Professional Responsibility for withholding only one piece of *Brady-Jencks* evidence.

For the purposes of this Petition, Petitioner respectfully asks the Court to focus on the extraordinary Due Process delays in this case pursuant to the *Barker* factors as suggested by Justice Sotomayor in her concurrence in *Betterman v. Montana*, 136 S.Ct. 1609 (2016). Not only does the Petitioner have a longer pre-indictment delay than the defendants in *Moore v. Arizona*, 414 U.S. 25 (1973) and *United States v. Marion*, 404 U.S. 307 (1971), he has suffered for a much longer time than the 28 months than Rocky Moore, who was a convicted murderer, and this is what the Supreme Court stated in the unanimous decision in his favor dismissing his indictment on Speedy Trial grounds:

> Moreover, prejudice to a defendant caused by delay in bringing him to trial is not confined to the possible prejudice to his defense in those proceedings. Inordinate delay, "wholly aside from possible prejudice to a defense on the merits, may 'seriously interfere with the defendant's liberty, whether he is free on bail or not, and . . . may disrupt his employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends. *Moore* at 27, *citing Marion* at 320

Recently, the Second Circuit dismissed the indictment of a marijuana grower who was indicted in October of 2008 but was not tried until May of 2015. The Second Circuit vacated his conviction and dismissed his indictment with prejudice, utilizing the same factors in *Barker. See United States v. Tigano*, 880 F.3d 602 (2d Cir. 2018). Since the Court realizes that the Petitioner is charged with illegal conduct going back to 2006 and 2007, and the Court

did not sentence him until of December 2018, the Petitioner is the new record holder for not just Speedy Trial violations, but for Due Process delay violations in that was accused of criminal conduct from 2006-2008, but was not tried until February 2016, and not sentenced until December 2018; fully ten years after the allegedly illegal conduct for which he was accused. The delay in *Tigano* was only seven years, and the Second Circuit termed that as "exceptional" and extraordinary. *Tigano* at 605-06.

Similarly, the delay in famous cases like *Doggett* was only eight years, *Loud Hawk* was seven years, and the defendant in *Barker* was only detained for a mere five months, whereas the Petitioner was detained by the Government's actions from December 28, 2015 to January 26, 2017. Therefore, by every Due Process delay standard, Petitioner is the new record holder both in the Second Circuit as well as nationally. When combined with the Sixth Amendment Speedy Trial Clause and the Speedy Trial Act violations in this case, it is difficult to imagine that Petitioner will not be successful on a new appeal when other cases within the Second Circuit have resulted in the dismissal of the defendant's indictment with prejudice; and the violations and delay in those cases are nowhere near the violations in Petitioner's case. *See, e.g., United States v. Bert*, 814 F.3d 70 (2d Cir. 2016) (delay of only 11 months); *United States v. Montecalvo*, 861 F. Supp. 2d 110, 120 (E.D.N.Y. 2012) (delay of 23 months); *United States v. Giambrone*, 920 F.2d 176 (2d Cir. 1990)(delay of only 90 days). This would thereby surpass the eight year Due Process violation record set by the marijuana growers of *Tigano* that the Second Circuit claimed to be "exceptional" and extraordinary. *Tigano* at 605-06. Therefore, Petitioner respectfully asks the Court to vacate his conviction and to dismiss his Superseding Indictment based on these extraordinary Due Process delay violations.

Petitioner should have been credited on his sentence for his entire time at Wyatt prior to and during his trial, as he spent more time in detention in both MDC Brooklyn and Wyatt than the defendant in *United States v. Benatta*, 2003 WL 22202371 (W.D.N.Y. 2003) did, and Benatta had his indictment dismissed for the Due Process and Speedy Trial delay violations in his case that were not as great as the overall Due Process delay violations in this case. Not only did Petitioner send letters to the Acting Director of the BOP and the Warden, both of which were ignored, his attorneys also sent letters to Paul Irby, the General Counsel of the BOP's Designation and Sentence Calculation Center (DSCC) in Grand Prairie, Texas. Therefore, Petitioner asks only for the Court to recognize the extreme Due Process delay violations in this case and order the dismissal of his Indictment.

Dismissal of an indictment for the Government's violation of §3161(j) is rare, and in fact it happened in *Benatta*, despite the holdings in cases such as *United States v. Lainez-Leiva*, 129 F.3d 89 (2d Cir. 1997) where the Court also recognized a Due Process violation, but it was not sufficient enough to dismiss the indictment. The reason that the dismissal of the indictment in *Benatta* is so important to Petitioner's case is that the defendant in *Benatta* was suspected by the FBI of being one of the 9/11 terrorists caught at the Canadian Border, and was held at MDC Brooklyn from the time of his indictment (December 12, 2001) to his release to the Immigration Court at the Batavia Federal Detention Facility on April 30, 2002, a delay of only 134 days.

However, in Petitioner's case, the Due Process Delay bullet that the Government cannot possibly dodge is 18 U.S.C. §3161(j)(1), (2), and (3), which provide as follows:

> (j)(1) If the attorney for the government knows that a person charged with an offense is serving a term of imprisonment in any penal institution, he shall promptly –

(B) cause a detainer to be filed with the person having custody of the prisoner and request him to so advise the prisoner and to advise the prisoner of his right to demand trial.

2. If the person having custody of such prisoner receives a detainer, he shall promptly advise the prisoner of the charge and of the prisoner's right to demand trial. If at any time thereafter the prisoner informs the person having custody that he does demand trial, such person shall cause notice to that effect to be sent promptly to the attorney for the government who caused the detainer to be filed.

3. Upon receipt of such notice, the attorney for the government shall promptly seek to obtain the presence of the prisoner for trial. *See Benatta* at *12-13.

In Petitioner's case, the Government knew that he was sentenced by the Judge in Boston in February of 2014, and his post-trial motions were denied in May of 2014 when the Government hit him with a Superseding Indictment with a whole new series of Money Laundering charges, one month before the Government knew that Petitioner would be reporting to prison. This adding of the Money Laundering Provisions "broadened" the original Indictment and set a new statute of limitations period of May 2009, which was clearly after the filing of applications in this case from 2006 through 2008. So, while the Government knew they were re-indicting Petitioner in May 2014 just before he reported to USP Canaan in June 2014, they did absolutely nothing as required by law under §3161(j) above. Then, without notifying Petitioner or his attorneys, they had Petitioner yanked out of his bunk after lights-out on December 28, 2015, and he was transferred to the same MDC Brooklyn that resulted in the defendant in *Benatta* having his indictment dismissed for only a violation of four months, whereas Petitioner's §3161(j) violation was over 18 months, and Petitioner has been held in Maximum Security at both MDC Brooklyn for 60 days and at Wyatt for over 180 days, which is double the amount of time *Benatta* spent in Maximum Security.

If a suspected 9/11 terrorist caught at the Canadian Border and held in MDC Brooklyn for only four months was released on Speedy Trial and Due Process grounds and had his indictment dismissed with prejudice pursuant to §3161(j), then Petitioner is well within his rights to respectfully request this Court dismiss his Indictment and vacate his Conviction. Once again, the defendant in *Ray* pleaded guilty to mail fraud, the Government forgot about her, and the district court sentenced her to six months of Halfway House which the Second Circuit reduced to zero to make up for the Due Process Delays in her case. Whereas in this case, the §3161(j) violation is at least two times greater than *Benatta*, and Petitioner was owed at least 12-months of time-served credits pursuant to §3585(b). So even assuming that Petitioner was guilty, which of course he was not based on *Kelly*, *Skilling* and *Countrywide*, he deserves the same Due Process considerations as the defendants in *Ray* and *Benatta*..

## X.    REQUESTED RELIEF

### RELIEF SOUGHT

Petitioner respectfully requests that the Court grant the instant Petition and issue an order: (i) vacating and setting aside the Order of Restitution and Petitioner's 2018 conviction for mail and wire fraud in its entirety; (ii) expunging and sealing all records of the foregoing indictment and conviction; (iii) ordering the Government to return all funds paid to the Government on behalf of Petitioner in this case; and (iv) granting such other and further relief as this Court deems just, equitable, and proper.

### EXPUNGEMENT

After a conviction is invalidated "district courts possess ancillary jurisdiction to expunge criminal records. That jurisdiction flows out of the congressional grant of jurisdiction to hear cases involving offenses against the United States pursuant to 18 U.S.C. § 3231." *See, e.g., United States v. Sumner,* 226 F.3d 1005, 1014 (9th Cir. 2000). Here, in the event the Court grants this Petition and invalidates Petitioner's conviction, Petitioner respectfully requests that this Court order the record of the conviction to be expunged and sealed. As discussed, *supra,* Petitioner's conviction is invalid as a matter of law and was premised on erroneous applications of the law that were never valid. Accordingly, Petitioner has demonstrated appropriate, extraordinary, and unusual circumstances to warrant the relief of expungement and the return of all funds paid to the Government over the past few years

### EXPEDITED RELIEF

Petitioner's conviction continues to prevent him from practicing law as an attorney, or acting as an insurance agent or working on any ERISA Employee Benefit Plan. This has caused and continues to cause significant financial instability to his family. In addition, it would be

better for Society to restore Petitioner's law license so that he may help other individuals who are still in prison and not able to afford legal counsel to help them prepare the necessary legal documents to secure their release. Petitioner helped to secure the early release of over 120 inmates pursuant to the First Step Act and the CARES Act during his period of incarceration. Accordingly, to the extent possible and practicable, Petitioner most respectfully requests that his Petition be treated on an expedited basis as the Due Process delays in this case have been extraordinary to date and far exceed any other case in the history of the Second Circuit. Petitioner would respectfully ask the Court to reinstate Petitioner's Bar License so that he can be on the CJA list or work with the NACDL or the Innocence Project to help the innocent and wrongfully accused.

# CONCLUSION

For all of the above reasons, it is respectfully submitted that the Court has a rare opportunity to correct a miscarriage of justice, inasmuch that Petitioner stands convicted of acts that the law does not make criminal, and Petitioner would suggest were never criminal under any proper understanding of the Mail and Wire Fraud statutes. Petitioner therefore respectfully asks the Court to vacate and set aside Petitioner's conviction and to expunge and seal all records of the indictment and conviction in this case, and order the Government to return all funds and to vacate the Order of Restitution in this case as described above.

Therefore, based on the major appellate decisions establishing a clarification of and an intervening change in the understanding of the law of Mail and Wire Fraud in *Countrywide, Takhalov, Weimert*, and *AEI v. Lincoln*, Petitioner respectfully moves this Court to reconsider and vacate Petitioner's Conviction and dismiss the untimely Superseding Indictment of May 14, 2014.

Dated: November 4, 2021

Respectfully Submitted,

_/s/ Daniel E. Carpenter_
Daniel E. Carpenter
Petitioner, *pro se*
18 Pondside Lane
West Simsbury, CT 06092

## CERTIFICATION

I hereby certify that on this 4th day of November, 2021, a copy of the foregoing was filed at the District of Connecticut Clerk's office in Hartford 450 Main Street, Hartford, CT 06103. Notice of this filing was also sent by USPS to US Attorney's Office Hartford Office, US Attorney's New Haven Office, Connecticut Financial Center, 157 Church Street, Floor 25, New Haven, CT 06510