UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DANIEL E. CARPENTER | : | Case No. 3:21-cv-1485 (RNC) |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES OF AMERICA | : | January 26, 2024 |

**GOVERNMENT'S MEMORANDUM IN OPPOSITION TO PETITIONER
DANIEL CARPENTER'S NOTICE OF RECENT SUPPLEMENTAL
AUTHORITY REGARDING *CIMINELLI V. UNITED STATES***

The United States of America (the "Government") respectfully submits this memorandum in opposition to petitioner Daniel Carpenter's notice of recent supplemental authority in support of his motion to vacate his conviction pursuant to 28 U.S.C. § 2255. Doc. 16. In his notice, he argues that his conviction must be vacated in light of the Supreme Court's recent decision in *Ciminelli v. United States*, 598 U.S. 306 (2023), which held that the right-to-control theory is not a valid basis for liability under the wire fraud statute. As explained more fully below, Carpenter has procedurally defaulted on his right to challenge the right-to-control theory of fraud because he did not raise the issue in his direct appeal of his conviction. In any event, the conviction should not be disturbed because the indictment in this case, the Government's evidence at trial, and the Court's extensive findings of fact in its 91-page verdict support his convictions on all counts without reliance on the right-to-control theory.

Accordingly, Carpenter's motion to vacate his conviction should be denied.

I.      **FACTUAL BACKGROUND**

The factual background of this criminal case is more fully set forth in the Government's initial memorandum in opposition to Carpenter's motion to vacate his conviction. *See* Doc. 10 (hereinafter "Govt.'s 2255 Opp.") at 1-3. Additional facts relevant to Carpenter's *Ciminelli* argument are set forth here.

The superseding indictment in this case charged Carpenter with 57 counts of mail fraud, wire fraud, conspiracy to commit mail and wire fraud, and money laundering offenses related to his involvement in a stranger-originated life insurance ("STOLI") scheme, in which he fraudulently induced insurance providers to issue and maintain life insurance policies on elderly strangers. *See United States v. Carpenter*, No. 3:13-CR-226-RNC (hereinafter "Criminal Case"), Doc. No. 53 (hereinafter, "Sup. Ind.").

The superseding indictment alleged that Carpenter and his co-conspirators engaged in a scheme to defraud insurance companies and to obtain their money and property by inducing them to issue STOLI policies—policies they otherwise would not have issued but for the misrepresentations on the applications—that entitled the beneficiaries of the policies to collect millions of dollars in death benefits upon the deaths of the insureds. Sup. Ind. ¶¶ 22-23, 25-26, 38, 40. The policies were procured for the purpose of reselling them for a profit after the two-year contestability period. *Id*. However, the straw insureds were promised a portion of the death benefit would go to their families if the insured died within the first two years. *Id.* The superseding indictment further alleged that Carpenter and his co-conspirators engaged in the scheme so that his companies could collect commissions that the insurance companies paid on each policy. Sup. Ind. ¶ 39. In addition, the superseding indictment alleged that the scheme created discrepancies between the benefits that the insurance providers reasonably anticipated from issuing the policies at issue and paying the accompanying millions of dollars in commissions to Carpenter, his entities, and others working with and/or on their behalf, and the actual benefits that the providers received in doing so. Sup. Ind. ¶ 38. In short, the superseding indictment alleged that the object of the scheme to defraud included obtaining commissions, death benefits, the STOLI policies, and creating discrepancies between the benefits the insurance providers reasonably anticipated from

issuing the policies benefits they actually received. *See* Sup. Ind. ¶¶ 22-23, 25-26, 38-39; *see also* id. ¶ 16 (noting that insurance providers were harmed in several ways by issuing STOLI policies that they otherwise would not have issued, including the payout of death benefits, paying out large commissions, and receiving less premium income than expected).

Following a bench trial in February and March of 2016, this Court issued a 91-page Verdict and Special Findings in which it found Carpenter guilty of each of the 57 counts of the superseding indictment. *United States v. Carpenter*, 190 F. Supp. 3d 260, 297 (D. Conn. 2016). At sentencing, the Court found that Carpenter's conduct caused a monetary loss to the insurance companies of approximately $53.3 million—an amount that the Second Circuit affirmed on appeal. *See United States v. Bursey*, 801 Fed. Appx. 1, 4 (2d Cir. 2020). In finding Carpenter guilty, the Court stated that the Government could satisfy its burden of proving that money and property were the object of the scheme by proving that the scheme "den[ied] the victim the right to control its assets by depriving it of information necessary to make economic decisions." *Carpenter*, 190 F. Supp. 3d at 265 (alteration in original).

After the verdict and prior to sentencing, Carpenter filed numerous post-trial motions, including a Rule 29 motion for acquittal that included a challenge to the right-to-control theory of fraud. *See* Criminal Case, Doc. 229 at 32-33, 76 and Doc. 283 at 6-7. The Court denied the motion in light of Second Circuit precedent, including *United States v. Binday*, upholding the right-to-control theory. Criminal Case, Doc. 312 at 6-10 (Tr. of Tel. Conf., Nov. 16, 2017) (denying Rule 29 motion), Doc. 300 (minute entry).

Carpenter then appealed his conviction. He raised five issues on appeal, claiming the district court erred by: (1) denying his motion to dismiss the indictment for violations of the Speedy Trial Act; (2) denying his motions to suppress evidence seized pursuant to the 2010 and 2011

search warrants; (3) erroneously calculating the loss amount; (4) holding that certain mailings and wires were timely and in furtherance of the fraud; and (5) erroneously treating certain death benefits as proceeds of fraud for the money laundering counts. *See* Govt.'s 2255 Opp, Ex. A (Carpenter's Brief on Appeal); *Bursey*, 801 Fed. Appx. at 2. Carpenter, however, did not challenge the right-to-control theory on appeal. The Second Circuit affirmed his conviction on appeal. *Id.* at 1, *cert. denied*, *Carpenter v. United States*, 141 S. Ct. 820 (2020).[1]

On November 5, 2021, Carpenter timely filed a petition to vacate his conviction pursuant to 28 U.S.C. § 2255. The Government filed its response in opposition to Mr. Carpenter's motion to vacate on July 30, 2022. Carpenter subsequently filed a reply memorandum on August 8, 2022, a supplemental addendum on November 14, 2022, and the instant notice of recent supplemental authority on August 3, 2023, in which he sought to vacate his conviction based on the Supreme Court's decision in *Ciminelli*. The Court entered an order directing the Government to respond to by January 5, 2024 to Carpenter's argument that his convictions must be vacated under *Ciminelli*. The Government's response deadline was subsequently extended to January 26, 2024.

## II.   LEGAL STANDARD

### A.   Collateral Relief Under 28 U.S.C. § 2255

As the Government noted in its initial memorandum, to obtain relief under 28 U.S.C. § 2255, a petitioner must show that his "sentence was imposed in violation of the Constitution or laws of the United States." 28 U.S.C. § 2255. The burden rests on the petitioner to show facts or law establishing that the conviction or sentence was unlawful. *See Lasher v. United States*, 970 F.3d 129, 131 (2d Cir. 2020); *United States v. Hoskins*, 905 F.3d 97, 103 n.6 (2d Cir. 2018).

---

[1] Carpenter's separate appeal of the restitution order has been held in abeyance, *see* Criminal Case, Doc. 475 (notice of appeal), *United States v. Carpenter*, Case No. 19-674 (2d Cir.), as the government's request to amend the restitution order remains pending in the criminal case, *see* Criminal Case, Doc. No. 485.

Habeas corpus relief is an extraordinary remedy, and "an error of law does not provide a basis for collateral attack unless the claimed error constituted 'a fundamental defect which inherently results in a complete miscarriage of justice.'" *United States v. Addonizio*, 442 U.S. 178, 185 (1979) (quoting *Hill v. United States*, 368 U.S. 424, 428 (1962)). The strictness of this standard reflects a recognition that collateral attack upon criminal convictions is "in tension with society's strong interest in [their] finality." *Ciak v. United States*, 59 F.3d 296, 301 (2d Cir. 1995); *see Hoskins*, 905 F.3d at 102 ("2255 review is narrowly limited in order to preserve the finality of criminal sentences and to effect the efficient allocation of judicial resources.") (internal quotations and citation omitted)). Accordingly, it has "long been settled law that an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment." *Addonizio*, 442 U.S. at 184.

### 1. Procedural Default Rule

As the Government noted in its initial memorandum, the "procedural default rule" "prevents claims that could have been brought on direct appeal from being raised on collateral review absent cause and prejudice." *Yick Man Mui v. United States*, 614 F.3d 50, 54 (2d Cir. 2010); *see* Govt.'s 2255 Opp. at 5 (summarizing applicable law).

Importantly, "[i]n order to demonstrate cause, a defendant must show some objective factor external to the defense such that the claim was so novel that its legal basis [was] not reasonably available to counsel." *Gupta v. United States*, 913 F.3d 81, 84 (2d Cir. 2019) (internal quotations marks and citations omitted). "Novelty, or futility, however, 'cannot constitute cause if it means simply that a claim was unacceptable to that particular court at that particular time.'" *Id.* at 84-85 (quoting *Bousley v. United States*, 523 U.S. 614, 622 (1998)). "[T]he mere fact that counsel failed to recognize the factual or legal basis for a claim, *or failed to raise the claim despite recognizing*

*it*, does not constitute cause for a procedural default." *Gupta,* 913 F.3d at 85 (emphasis in original). Even if a petitioner can demonstrate cause for failing to raise an issue on appeal, he must still show actual prejudice. *Yick Man Mui,* 614 F.3d at 54; *see* Govt.'s 2255 Opp. at 5.

### 2.   Attacks Based on Errors in Law

In the context of a direct appeal, a district court's erroneous instructions at trial on the elements of an offense are harmless, and do not require reversal of a conviction, if the "verdict would have been the same absent the error[.]" *Neder v. United States*, 527 U.S. 1, 17 (1999); *United States v. Martoma*, 894 F.3d 64, 72 (2d Cir. 2017) ("Even with respect to an instructional error that 'incorrectly omitted an element of the offense,' we will not overturn a conviction 'if we find that the jury would have returned the same verdict beyond a reasonable doubt[.]'" (quoting *United States v. Nouri*, 711 F.3d 129, 139-40 (2d Cir. 2013)); *United States v. Choudhry*, 649 Fed. Appx. 60, 63 (2d Cir. 2016) ("If it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty had it been properly instructed, we will hold that the error was harmless."); *United States v. Jordan*, 639 Fed. Appx.768, 769–70 (2d Cir. 2016) ("If we conclude that the jury would have rendered the same verdict beyond a reasonable doubt, the conviction will be sustained."); *United States v. Cedeno*, 437 Fed. Appx. 8, 12 (2d Cir. 2011) ("Even assuming there was error, if this Court finds beyond a reasonable doubt that the jury would have returned the same verdict, the conviction is sustained"); *United States v. Gomez*, 580 F.3d 94, 101 (2d Cir. 2009) ("To sustain the conviction, we must find that the jury would have returned the same verdict beyond a reasonable doubt."); *United States v. Jackson*, 196 F.3d 383, 386 (2d Cir. 1999) (the test is "whether the verdict, absent the error, would have been the same.")

In making this determination, a reviewing court limits itself "to the evidence actually presented to the jury." *United States v. Miller*, 954 F.3d 551, 558 (2d Cir. 2020). If the evidence

bearing on the properly instructed element is "overwhelming and essentially uncontroverted, there is no basis for concluding that the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Nouri*, 711 F.3d at 140 (internal quotations and citation omitted). If the evidence, however, is controverted, reviewing courts look to "(a) whether there was sufficient evidence to permit a jury to find in favor of the defendant on the [] element, and, if there was, (b) whether the jury would nonetheless have returned the same verdict of guilty." *Id.*

The same standard is applied when an such an error is being challenged in a § 2255 proceeding, and an error in law does not entitle a petitioner to relief under § 2255 if "the verdict and the trial evidence" provide "a high degree of confidence that a properly instructed jury would have convicted" the petitioner. *Colotti v. United States*, 71 F.4th 102, 116 (2d Cir. 2023).

**B.     The Supreme Court's Decision in *Ciminelli v. United States***

In *Ciminelli*, the Supreme Court examined the basis of liability under the federal wire fraud statutes, which criminalizes "scheme[s] or artifice[s] to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 598 U.S. 308 (quoting 18 U.S.C. § 1343). The Court held that the "money or property" requirement in federal fraud statutes "reaches only traditional property interests." 598 U.S. at 316. The Court rejected the notion that "mere information" could be an interest protected by the mail and wire fraud statutes. *See id.* at 315. Accordingly, the Court held that the Second Circuit's "longstanding right-to-control theory of fraud," under which a "defendant is guilty of wire fraud if he schemes to deprive the victim of potentially valuable economic information necessary to make discretionary economic decisions[,]" is not a valid basis for liability under the federal fraud statutes. *Id.* at 308-309, 316; *see id.* at 312 (explaining that under the right-to-control theory, the "cognizable harm occurs where

7

the defendant's scheme denies the victim the right to control its assets by depriving it of information necessary to make discretionary economic decisions.").

### III.   <u>DISCUSSION</u>

**A.  Carpenter challenge based on *Ciminelli* is barred by procedural default.**

Carpenter cannot seek to vacate his conviction based on the Supreme Court's holding in *Ciminelli* because Carpenter failed to challenge the right-to-control theory in his direct appeal. Accordingly, his argument is procedurally defaulted. *See, e.g., Yick Man Mui*, 614 F.3d at 54.

As noted above, after this Court issued its verdict finding Carpenter guilty, Carpenter filed a Rule 29 motion for judgment of acquittal, where he argued that the right-to-control theory was not a valid basis for liability under the mail and fire fraud statutes. *See* Criminal Case, Doc. 229 at 32-33, 76 and Doc. 283 at 6-7. The Court denied the motion in light of Second Circuit precedent, including *United States v. Binday*, upholding the right-to-control theory. Criminal Case, Doc. 312 at 6-10 (Tr. of Tel. Conf., Nov. 16, 2017) (denying Rule 29 motion), Doc. 300 (minute entry).

Accordingly, Carpenter was well aware of his right to control argument before he filed his criminal appeal, having raised the argument in the criminal case. However, he declined to challenge the right-to-control theory in his direct appeal. *See* Govt.'s 255 Opp., Ex. A (Carpenter's Brief on Appeal). As a result, Carpenter has procedurally defaulted on this issue and cannot raise it now, even in light of *Ciminelli,. See, e.g., Yick Man Mui*, 614 F.3d at 54; *Gupta*, 913 F.3d at 84-85.

The fact that Second Circuit precedent had repeatedly upheld the right-to-control theory before his appeal does not excuse his procedural default. As noted above, "futility, however, 'cannot constitute cause [for failing to raise a claim on direct review] if it means simply that a claim was unacceptable to that particular court at that particular time.'" *Id.* at 84-85 (quoting

*Bousley*, 523 U.S. at 622); *see, e.g., Gatewood v. United States*, 979 F.3d 391, 396 (6th Cir. 2020) ("Even the alignment of the circuits against a particular legal argument does not equate to cause for procedurally defaulting it. . . . [U]nless the Supreme Court has decisively foreclosed an argument, declarations of its futility are premature." (internal quotations and citations omitted).); *Page v. United States*, 440 Fed. Appx. 767, 769 (11th Cir. 2011) ("the fact that this Circuit's precedent may have been adverse to Page's claim does not mean that the appeal was 'unavailable.'" (citing *Bousley*)); *United States v. Moss*, 252 F.3d 993, 1002 (8th Cir. 2001) ("Procedural default also cannot be overcome because the issue was settled in the lower courts. The Supreme Court has rejected the argument that default can be excused when existing lower court precedent would have rendered a claim unsuccessful." (citing *Bousley*)).[2]

Likewise, the fact that *Ciminelli* was decided after his direct appeal also does not excuse him from procedural default. On this point, the Second Circuit's decision in *Gupta* is instructive. In *Gupta*, the petitioner appealed the district court's decision denying his 2255 motion, which argued that the court's instructions to the jury as to the "personal benefit" component of an insider trading offense were legally invalid in light of the Second Circuit's subsequent decision in *United States v. Newman*, 773 F.3d 438 (2d Cir. 2014), which was decided after his direct appeal of his

---

[2] In Carpenter's notice of supplemental authority, Carpenter argues that the Supreme Court's decision in *Bousely* supports his position because in that case, although Bousley had procedurally defaulted by failing to raise his claim on direct review, that default did not bar relief insofar as petitioner could establish actual innocence. *See* Doc. 16 at 6-7. While "actual innocence" can excuse procedural default, "to establish actual innocence, [a] petitioner must demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." *Bousley*, 523 U.S. at 623 (internal quotations and citation omitted). "[A]ctual innocence means "factual innocence, not mere legal insufficiency." *Id.* Here, as explained in the next section below, Carpenter cannot show factual innocence, and this Court's findings of fact from the first trial support his convictions without reliance on the right-to-control theory.

For the same reasons, Carpenter's reliance on *Fiore v. White*, 531 U.S. 225, 228 (2001) is also misplaced. *See* Doc. 16 at 7-8. There, the Supreme Court held that Due Process Clause prohibited the state from convicting a defendant "for conduct that its criminal statute, *as properly interpreted*, does not prohibit." *Id.* (emphasis added). Here, however, as explained in the next section below, this Court's findings of fact establish that Carpenter did violate the criminal mail and wire fraud statutes, as properly interpreted.

conviction. *Gupta*, 913 F.3d at 83. The district court denied the 2255 motion, concluding principally that the petitioner, who had objected to those instructions at trial, procedurally defaulted by not pursuing his objection in his direct appeal from his conviction. *See id.* The Second Circuit affirmed the district court's decision to deny 2255 relief, finding that the petitioner had not shown any cause to excuse his procedural default. *See id*. at 85. The Second Circuit noted that not only had defendants in other insider trading prosecutions raised similar objections to the jury instruction, the petitioner also objected to the instruction at trial. *See id.* Accordingly, the Second Circuit concluded that he failed to present a "viable claim" that his "challenge was unavailable to his counsel on appeal." *Id.*

In *Gupta*, the Second Circuit cited with approval its summary order in another case, *Whitman v. United States*, 754 Fed. Appx. 40, 41 (2d Cir. 2018). In that case—another insider trading case in which the direct appeal was decided shortly before *Newman*—the defendant had similarly objected at trial to the court's personal benefit instruction but did not pursue that objection on appeal. *See id.* at 41-43. The Second Circuit concluded that the defendant did not show cause for his failure to challenge the personal benefit instructions on appeal because "[i]f other counsel were able to raise the argument, including Whitman's own former attorney, we cannot say the same argument was unavailable to his appellate counsel." *Id.* at 43.

Here, Carpenter declined to challenge the right-to-control theory on appeal. *See* Govt.'s 2255 Opp, Ex. A (Carpenter's Brief on Appeal). Over the years, numerous defendants challenged their convictions on the right-to-control theory, notwithstanding Second Circuit precedent upholding the theory. *See, e.g., United States v. Lebedev*, 932 F.3d 40 (2d Cir. 2019), *United States v. Finazzo*, 850 F.3d 94, 96 (2d Cir. 2017), *United States v. O'Garro*, 700 Fed. Appx. 52, 54 (2d Cir. 2017), *United States v. Binday*, 804 F.3d 558 (2d Cir. 2015), *United States v. Viloski*, 557 Fed.

Appx. 28 (2d Cir. 2014). Indeed, Ciminelli raised the argument in his appeal and was successful. *See Ciminelli*, 598 U.S. at 308-09. Accordingly, like the petitioners in *Gupta* and *Whitman*, Carpenter has procedurally defaulted on this issue and cannot raise it now. *See, e.g., Gupta*, 913 F.3d at 84-85; *Whitman*, 754 Fed. Appx. at 43 ("[i]f other counsel were able to raise the argument, including [petitioner's] own former attorney, we cannot say the same argument was unavailable to his appellate counsel.").

Even if Carpenter's failure to challenge the right-to-control theory in his appeal is excusable, he cannot show actual prejudice because his convictions can be sustained on the merits, as explained in the next section below.

**B.      Carpenter's convictions should be sustained without reliance on the right-to-control theory.**

Regardless of the Court's decision on procedural default, the Court should also sustain Carpenter's convictions because the trial evidence and the Court's findings of fact support his convictions without reliance on the right-to-control theory.

Nothing in *Ciminelli* alters the essential elements that this Court determined the Government was required to prove at trial: "(1) a scheme to defraud, (2) money or property [as the object of the scheme], and (3) use of the mails [or wires to further the scheme." *Carpenter*, 190 F. Supp. 3d at 265; *see United States v. Jabar*, 19 F.4th 66, 76 (2d Cir. 2021).[3]

---

[3] Though the Court emphasized right-to-control in its Verdict, it can be no surprise to Carpenter that the Court may also find him liable under traditional money-and-property theories of wire and mail fraud liability. Throughout pretrial litigation, the Government made clear that he was liable under both. *See, e.g.*, Criminal Case, Doc. 84 (Response to Carpenter's Motion to Dismiss) at 24 ("In contrast, Carpenter's scheme contemplated the deprivation from the Providers – the victims – of money, property in the form of insurance contracts, and the Providers' right to control how corporate assets were spent. Each of these is cognizable under the mail and wire fraud statutes." (internal citation omitted); *id*. at 22 ("the Superseding indictment is clear in alleging that Carpenter's scheme contemplated pecuniary harm to the providers"); Criminal Case, Doc. 161 (Government's Trial Memo) at 3-4 ("To this end, the Government will present evidence of five distinct ways in which the Providers were harmed: (1) the earlier payout of death benefits; (2) less premium income from the policies than anticipated; (3) mispriced policies because of undermined actuarial assumptions; (4) decreased cash flow; and (5) larger than warranted commissions."). The Government's dual reliance distinguishes this case from *Ciminelli*, where the defendant was only charged, and the jury was only instructed, under the right-to-control theory. 598 U.S. at 316.

The only aspects of the Court's verdict that are no longer valid in light of *Ciminelli* are the Court's conclusions on the defendant's fraudulent intent and on the second element, money or property as the object of the scheme. In its verdict, the Court concluded that [a]t a minimum, [Carpenter] intended to deprive them of economically valuable information, which is cognizable harm under the wire and mail fraud statutes." *Carpenter*, 190 F. Supp. 3d at 298. As to the second element, money or property as the object of the scheme, the Court concluded that [t]his element is easily satisfied here" because "[t]he misrepresentations in the applications deprived the providers of information necessary to make discretionary decisions whether to issue the policies[.]" *Id.*

The Supreme Court has now held that "potentially valuable economic information necessary to make discretionary economic decisions is not a traditional property interest" for purposes of the mail and wire fraud statutes. *Ciminelli*, 598 U.S. at 309. Even after this narrowing of the statute, however, the evidence presented at trial and the Court's findings of fact are sufficient sustain the mail and wire fraud convictions.

The Court's verdict makes clear that Carpenter's scheme to defraud was designed to obtain money from the victim insurance companies, as required under the mail and wire fraud statutes. First, Carpenter intended to obtain—and did obtain—lucrative commissions from the insurance companies on each of the STOLI policies, as alleged in the superseding indictment. Sup. Ind. ¶ 39. The Court found that "[c]ommissions paid to agents can range between 70 and 130 percent of the 'target' premium for the first year. For policies with face values in excess of $2 million, the first-year commission can be several hundred thousand dollars." *Carpenter*, 190 F. Supp. 3d at 268. The Court further found that Carpenter "mandated that TPG [Group]"—which the Court concluded was controlled by Carpenter—"receive 40 percent of the commission or 'no deal.'" *Id.* at 274 (citing Govt. Tr. Ex. 2033 at 2); *id.* at 286 n.40 & n.41. The Government's evidence showed

that the insurance companies paid TPG Group over $12 million in commissions on these STOLI policies—policies they would not have issued but for the misrepresentations on the insurance applications. *See* Govt. Tr. Ex. 3 (summary chart showing first-year commissions on all COT policies). The Second Circuit affirmed that these commissions were the object of Carpenter's scheme. *Bursey*, 801 Fed. Appx. at 5 ("the scheme did not reach fruition until . . . Carpenter's companies received commissions.").

These commissions, which are money, plainly satisfy the "money or property" requirement of the mail and wire fraud statutes and there can be no doubt that Carpenter intended to deprive the insurance companies of this money. 18 U.S.C. §§ 1341, 1343; *see United States v. Bazemore*, 608 Fed. Appx. 207, 211 (5th Cir. 2015) ("commission payments" paid by victim insurers to defendant in STOLI scheme "were clearly money that legally belonged to the insurers" and "unquestionably money or property under the mail fraud statute.").

Second, the death benefit payments were objects of the scheme. As the Court found, to induce the straw insureds to participate in the Charter Oak Trust, "[t]he prospective insureds were promised free life insurance for two years. They were told that if they died during the two-year period, the policy proceeds[,]" *i.e.*, the death benefit payment, "would be disbursed to their beneficiaries." *Carpenter*, 190 F. Supp. 3d at 280-81. Death benefit payments from the insurance companies is undeniably money that satisfies the "mail and property" requirement of the mail and wire fraud statutes.

Third, the life insurance policies (*i.e.*, a right to receive money from the insurance company upon the death of the insured) themselves, which Carpenter procured in order to sell them for a profit, also were objects of the scheme. *Carpenter*, 190 F. Supp. 3d at 267 n.7 ("there is overwhelming evidence that the defendant orchestrated a scheme to defraud the carriers into

issuing policies based on STOLI-related misrepresentations, which defeated the carriers' attempts to detect and avoid STOLI business."); *id.* at 273 ("The Charter Oak Trust was formed by the defendant to serve, and did serve, as a vehicle for obtaining STOLI policies[.]"); *id.* at 297 ("The defendant oversaw the development and execution of a plan to defraud life insurance providers by using misrepresentations to induce them to issue STOLI policies. Pursuant to the defendant's plan, high value policies were procured by means of misrepresentations characteristic of 'stealth STOLI' and 'STOLI in disguise.'"). Through his scheme, Carpenter sought to obtain, and succeeded in obtaining, 84 insurance policies that gave him, the companies he controlled, other scheme participants, and others who later bought the policies on the secondary market the right to collect hundreds of millions of dollars from the insurance companies. *See* Govt. Tr. Ex. 3 (summary chart showing face value of COT policies exceeded $450 million).

The STOLI policies—which obligated the insurance companies pay money on the death of the insured—qualify as "money or property." 18 U.S.C. §§ 1341, 1343; *see Pasquantino v. United States*, 544 U.S. 349, 356 (2005) ("The right to be paid money has long been thought to be a species of property." (citing Founding-era treatises)); *United States v. Ali*, 620 F.3d 1062, 1067 (9th Cir. 2010) ("A right to payment is "money or property" under 18 U.S.C. §§ 1341 and 1343."); *see also Ciminelli*, 598 U.S. at 317–18, (Alito, J., concurring) (explaining that the majority opinion did not address whether the government could retry the defendant "on the theory that he conspired to obtain, and did in fact obtain, by fraud, a traditional form of property, viz., valuable contracts.").

Finally, the evidence at trial shows that Carpenter had the fraudulent intent to harm the insurance companies by inducing them to pay these commissions, pay the death benefits, and issue the policies, all based on Carpenter's deceit. *See United States v. Jabar*, 19 F.4th 66, 76 (2d Cir. 2021) (requiring proof of deceit and "contemplated harm to the victim"). As the Court found,

Carpenter "understood the 'evils of STOLI,' knew the providers did not want to issue STOLI policies and was aware of the actions they had taken to detect and avoid STOLI business." *Carpenter*, 190 F. Supp. 3d at 297. The Court found that Carpenter played a key role in instructing others on how to answer STOLI-related questions on the insurance applications in order to deceive the carriers. *See id.* at 284-85. He mandated the preparation of two premium payment illustrations: one showing level yearly premium payments throughout the life of the policy, which would be given to the insurance companies, and the other showing minimum funding after payment of the first year's target premium (on which commissions were based), which was not provided to the carriers because, as the Court found, "the illustration showing minimal funding would arouse suspicion." *Id.* at 287; *see id.* at 268 (finding that "[c]ommissions paid to agents can range between 70 and 130 percent of the 'target' premium for the first year."). Based on this evidence, the Court concluded that "by using misrepresentations to defeat the providers' attempts to ensure that STOLI would not be issued, he contemplated doing actual harm to the providers." *Id.* at 297.

That conclusion—that Carpenter's scheme contemplated taking money or property from the insurance providers—was buttressed by the unequivocal testimony at trial that a STOLI promoter's gain was necessarily at the insurance company's expense. As Ken Elder explained, "STOLI or IOLI is the antithesis of an insurance contract. Whereas an insurance contract is seeking to protect against an undesired loss, a STOLI or IOLI situation is seeking to profit from the financial gain." Tr. 2179; *see also* Tr. 2253 (Parker). In every case, the STOLI promoter is seeking gain "from the policy's death benefit being in excess of premiums paid into the policy." Tr. 2253 (Parker). It is a bet by investors—here Carpenter—that they can leverage their knowledge of the insured and their investment strategy to profit from the policy. *See* Tr. 2187 (Best: "understand that with STOLI, the point is that the investor is betting that this individual is going to die soon.

They want the death benefit and they don't want to pay premiums any more than they have to."). Thus, rather than purchasing a product from the provider, a STOLI investor is pitting himself against the provider, betting that he can outperform the provider's expectations. *See Sciaretta v. Lincoln National Life Insurance Co.*, 778 F.3d 1205, 1208-09 (11th Cir. 2015) ("A STOLI policy is a speculative investment device that entails gambling on the lives of the elderly. . . . the sooner the insured dies, the fewer the premium payments that are necessary to obtain the payout, and the greater the return on investment.").

In that context, Carpenter sought an edge by which he could stack the deck in his favor, by leveraging an informational advantage and by using strategies that were atypical of legitimate insurance purchasers. Carpenter funded policies only where he believed he would make money, and by extension, the provider would lose money. He *intended* to use his informational advantage to cause loss to the provider.  As Carpenter himself aptly explained, "our game is arbitrage against the carrier."  Govt. Tr. Ex. 2113.[4]  In short, when Carpenter lied on insurance applications, the object of those lies was to beat the insurance companies by profiting undeserved money and property at their expense.

In summary, even though *Ciminelli* invalidated the right-to-control theory, the Court should sustain Carpenter's convictions on the mail and wire fraud counts because the trial evidence and the Court's findings of fact show that Carpenter is guilty on those counts without relying on the right-to-control theory. Because the Court had found that the money laundering and illegal monetary transaction counts were premised on Carpenter's use of the death benefit proceeds from two policies on Sash Spencer, which the Court concluded were procured through the same scheme to defraud as the other policies, the Court should sustain those convictions as well. *See, e.g.,*

---

[4] Whether Carpenter succeeding that arbitrage is irrelevant. *See Jabar*, 19 F.4th at 77 ("Proof of actual injury to the victim is not required because the scheme need not have been successful or completed.")

*Colotti*, 71 F.4th at 102 (denying 2255 relief because "the verdict and the trial evidence" provided

"a high degree of confidence that a properly instructed jury would have convicted" the petitioner.).

IV.     **CONCLUSION**

For the foregoing reasons, the Government submits that Carpenter's 2255 motion to vacate

his conviction should be denied.

                                                      Respectfully submitted,

                                                      VANESSA ROBERTS AVERY
                                                      UNITED STATES ATTORNEY


                                                      */s/ Neeraj N. Patel*
                                                      NEERAJ N. PATEL
                                                      ASSISTANT U.S. ATTORNEY
                                                      Federal Bar No. phv04499
                                                      157 Church Street, 25th Floor
                                                      New Haven, CT 06510
                                                      Tel: 203-821-3700
                                                      Email: Neeraj.Patel@usdoj.gov


                                                      */s/ David E. Novick*
                                                      DAVID E. NOVICK
                                                      ASSISTANT U.S. ATTORNEY
                                                      Federal Bar No. phv02874
                                                      157 Church Street, 25th Floor
                                                      New Haven, CT 06510
                                                      Tel: 203-821-3700
                                                      Email: David.Novick@usdoj.gov

<u>CERTIFICATION OF SERVICE</u>

This is to certify that on January 26, 2024, a copy of the foregoing Memorandum was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail on anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

*/s/ Neeraj N. Patel*
NEERAJ N. PATEL
ASSISTANT UNITED STATES ATTORNEY